No. 2--06--0088        Filed: 4-9-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 01--CF--2224 |
| JAMAL L. COLLINS, a/k/a Jamel Collins, | ) ) | Honorable John T. Phillips, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE GROMETER delivered the opinion of the court:

Following a jury trial in the circuit court of Lake County, defendant, Jamal L. Collins, a/k/a Jamel Collins, was convicted of first-degree murder (720 ILCS 5/9--1(a)(1) (West 2000)) in connection with the stabbing death of Jaime Hernandez. On direct appeal, defendant argued, inter alia, that he was prejudiced when the jury foreman sua sponte visited the crime scene during defendant's trial. A majority of this court agreed with this contention, reversed defendant's conviction, and remanded the cause for a new trial. People v. Collins, 351 Ill. App. 3d 175 (2004). Following a new trial by jury, defendant was convicted of second-degree murder (720 ILCS 5/9--2(a) (West 2000)). In this appeal, defendant argues that his conviction must be reversed because he was denied his statutory right to a speedy trial (725 ILCS 5/103--5 (West 2000)) on remand. We disagree and therefore affirm.

We initially provide a general background of the events leading to this appeal. Other relevant facts will be discussed as they become pertinent to our analysis. At his first trial, defendant did not deny stabbing Hernandez, but testified that he did so in self-defense. See Collins, 351 Ill. App. 3d at 189-90 (Kapala, J., dissenting). At the time of the stabbing, both defendant and Hernandez were naval recruits stationed at the Great Lakes Naval Training Center in North Chicago, Illinois. The stabbing occurred near the naval base, and several of the witnesses who were expected to testify at defendant's second trial were Navy personnel.

Upon remand, the parties initially appeared before the court on January 11, 2005. At that time, defendant's attorney, Jed Stone, filed a written speedy-trial demand, answered "ready" for trial, and orally demanded trial. However, the State had difficulty reassembling some of its witnesses as they had been deployed on various assignments throughout the world. Thereafter, defendant persistently answered "ready" for trial and demanded trial, with the exception of two defense motions for continuances, one of which was denied, and the other of which extended the trial date by one day.

Defendant's trial was scheduled to begin on April 19, 2005, within the 120-day speedy-trial term (see 725 ILCS 5/103--5 (West 2000)). However, in the midst of jury selection, the State told the court that Stone was representing Kurt Nash, Jr. (Kurt), in an unrelated criminal case. Kurt was the son of Kurt Nash, Sr. (Detective Nash), a North Chicago police officer. Detective Nash was called as a witness by the State at defendant's original trial, and the State expected him to be a prosecution witness at defendant's second trial. The State told the court that Stone had just informed it that Detective Nash had paid Stone to represent Kurt. The State suggested that Stone's representation of both Kurt and defendant presented a "per se conflict of interest." With respect to the State's claim, the court learned that sometime prior to April 7, 2005, Detective Nash contacted

Stone about representing Kurt in a criminal matter. Stone agreed to represent Kurt for a $7,500 fee. Detective Nash later scheduled an appointment to meet with Stone. Although Detective Nash's sister provided the funds to pay Stone, Detective Nash testified that he had agreed to reimburse his sister. Detective Nash also indicated that the "potential" existed for Stone to represent the Nashes in a civil suit resulting from Kurt's arrest. Ultimately, the trial court rejected the State's notion that a per se conflict of interest existed. Nevertheless, the court did find that defendant's entitlement to representation by an attorney of his choice was overcome by the State's showing of a "serious potential for conflict." See People v. Ortega, 209 Ill. 2d 354 (2004); People v. Holmes, 141 Ill. 2d 204 (1990). The conflict issue was resolved on May 17, 2005, when defendant agreed to waive any issue relating to a conflict arising from Stone's representation. At that time, the court charged defendant with any delay related to resolving the conflict issue.

By the time the matter was resolved, the State's military witnesses were no longer available, and the State was unable to reassemble them until November 2005. On November 7, 2005, defendant filed a motion to dismiss the charges against him on speedy-trial grounds. The trial court denied the motion, again finding that any delay arising from Stone's potential conflict was attributable to defendant. Defendant's trial finally got underway on November 21, 2005, and the jury convicted defendant of second-degree murder. Defendant filed a posttrial motion, arguing, among other things, that his right to a speedy trial had been violated. The trial court denied the motion and sentenced defendant to 19½ years' imprisonment. This appeal ensued.

The principal issue raised on appeal is whether defendant was denied his statutory right to a speedy trial. The purpose of the statutory right to a speedy trial is to "guarantee a speedy trial and not 'to open a new procedural loophole which defense counsel could unconscionably use to obstruct

the ends of justice.' " People v. Gooden, 189 Ill. 2d 209, 221 (2000), quoting People v. George, 71 Ill. App. 3d 932, 934 (1979). In accordance with this notion, section 103--5 of the Code of Criminal Procedure of 1963 (725 ILCS 5/103--5 (West 2000)), also known as the Speedy Trial Act (Act), provides in relevant part that "[e]very person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant." A defendant who is not tried within the time period designated by the Act must be discharged from custody and the charges dismissed. 725 ILCS 5/103--5(d) (West 2000); People v. Kliner, 185 Ill. 2d 81, 114-15 (1998).

With respect to the calculation of the speedy-trial term, our supreme court has stated that, "when a defendant prevails in an Illinois court of review, a new statutory 120-day term will commence running when the mandate issues and is docketed in the trial court." People v. Crane, 195 Ill. 2d 42, 49 n.2 (2001), citing People v. Worley, 45 Ill. 2d 96, 98 (1970); see also People v. Quick, 321 Ill. App. 3d 392, 394 (2001); People v. Williams, 272 Ill. App. 3d 868, 876-77 (1995). Here, our mandate issued on December 30, 2004. However, it was not filed in the trial court until January 4, 2005, and, as noted, the date the mandate is docketed in the trial court is the date from which the speedy-trial term is computed. Crane, 195 Ill. 2d at 49 n.2; see also People v. Jones, 104 Ill. 2d 268, 284 (1984) ("[T]he speedy-trial period begins to run on the date that the mandate is filed and not the date that the mandate is issued by the appellate court"). It is undisputed that a one-day continuance occurring prior to defendant's trial was attributable to defendant. With that continuance taken into consideration, the 120th day following the filing of the mandate was May 5, 2005. Defendant's trial did not start until November 21, 2005, well beyond the 120-day speedy-trial term.

However, as noted above, the Act contemplates the tolling of the speedy-trial term where the delay is attributable to the defendant. 725 ILCS 5/103--5(a), (f) (West 2000); People v. Jones, 273 Ill. App. 3d 377, 380 (1995). Thus, the issue in this case becomes whether the trial court erred in attributing to defendant for purposes of calculating the speedy-trial term the delay from April 19, 2005, through the date of trial. The defendant bears the burden of establishing facts that demonstrate a violation of the Act. People v. Hall, 194 Ill. 2d 305, 327 (2000). Here, defendant asserts various reasons why the delay should not be attributed to him. Principal among these reasons is defendant's claim that it was the State's "groundless claims" about a potential conflict of interest involving Stone that led to the delay. Accordingly, our first task is to determine whether the State's claim was groundless.

In evaluating a claim that counsel is laboring under a conflict of interest that requires disqualification, a trial court must engage in a two-step analysis. Initially, the court must determine whether there is an actual conflict of interest or there is a showing of "serious potential for conflict" between the interests of an attorney and his or her client. Ortega, 209 Ill. 2d at 361, citing Wheat v. United States, 486 U.S. 153, 164, 100 L. Ed. 2d 140, 152, 108 S. Ct. 1692, 1700 (1988); see also People v. James, 368 Ill. App. 3d 433, 436 (2006). If a conflict is found to exist, the court must then determine whether the interests threatened by the conflict overcome the presumption favoring defendant's chosen counsel. Ortega, 209 Ill. 2d at 361. In weighing the presumption against a defendant's interests, the court may consider various factors, including "(1) the defendant's interest in having the undivided loyalty of counsel; (2) the State's right to a fair trial; (3) the appearance of impropriety should the jury learn of the conflict; (4) the probability that continued representation by counsel of choice will provide grounds for overturning a conviction"; and (5) whether the State's

claim that a conflict warrants disqualification is the result of overreaching. Ortega, 209 Ill. 2d at 361-62. If the court finds that the presumption favoring defendant's chosen counsel has been overcome, it may, under certain circumstances, allow the defendant to waive any conflict. See Ortega, 209 Ill. 2d at 364. "However, a valid waiver by itself does not negate the trial court's authority to deny counsel of choice." Ortega, 209 Ill. 2d at 364. In this case, defendant eventually waived any conflict associated with Stone's representation and he was allowed to proceed with his counsel of choice. Thus, we are not concerned with the second step of the analysis.

With respect to the first step of the analysis, we note that the trial court in this case correctly determined that the facts did not support the existence of a per se conflict of interest. As the Illinois Supreme Court recently made clear, "a per se conflict applies only to cases where a defendant claims ineffective assistance of counsel due to his attorney's conflict." Ortega, 209 Ill. 2d at 364. In this case, defendant raised no claim of ineffective assistance of counsel, and the State does not seriously dispute on appeal the trial court's finding that a per se conflict did not exist. Thus, we turn to whether the trial court erred in finding the existence of a "serious potential for conflict." We employ an abuse-of-discretion standard in reviewing a trial court's finding regarding the existence of a serious potential for conflict. Ortega, 209 Ill. 2d at 359-60; James, 368 Ill. App. 3d at 436. A court abuses its discretion when its decision is fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it. Ortega, 209 Ill. 2d at 359. Given the deference that we must accord the trial court's ruling, we find it helpful to provide a more in-depth review of the sequence of events leading to this appeal.

As noted above, the parties convened on April 19, 2005, to begin jury selection for defendant's trial. Following a recess for lunch that day, the State told the trial court that it had just

learned that Detective Nash had paid Stone to represent Kurt. The State took the position that Stone's representation of both defendant and Kurt presented a per se conflict of interest. Stone disagreed, arguing that no conflict existed because he was representing the son of a witness, not the witness himself. Stone acknowledged that a portion of his representation fee was delivered by Detective Nash, but he asserted that paying a fee does not create a "relationship." The State reiterated, however, that Stone's acceptance of money from Detective Nash, who was expected to provide testimony contradicting defendant's claim of self-defense, created a financial relationship between Stone and Detective Nash. The State further posited that there was evidence that Stone may represent Kurt in future cases, including a potential civil case against the law-enforcement agencies involved in Kurt's arrest. Thus, the State reasoned that Stone had a financial incentive to please Detective Nash, and his loyalty would be divided between the interests of defendant and those of Detective Nash. For his part, Stone admitted that Detective Nash inquired about representing Kurt and that the Nashes met Stone at his office, although Stone recalled that he "talked about the facts of the case" only with Kurt. Stone first appeared on Kurt's behalf on or about April 7, 2005. Stone indicated that for his representation of Kurt he had been paid in two installments. The first installment of $4,000 came from Kurt's aunt. The second installment of $3,500 was delivered by Detective Nash, but Stone was unsure of the source of the funds.

Following a short recess, the State presented the court with a written motion to disqualify Stone, asserting that Stone's "continued representation" was a per se conflict of interest. Upon presenting the motion to the court, the State argued that Stone might not conduct adequate cross-examination of Detective Nash given the financial relationship that had developed. Stone responded that the record failed to support the existence of a conflict and that the State's motion to disqualify

him "due to an actual or perceived conflict" was "nothing more than the government's way of removing an aggressive lawyer" from defendant's case. Stone added that the State was aware that he was representing Kurt as early as April 7, 2005, although he acknowledged that it was not until the Thursday or Friday of the week before defendant's trial was set to begin that Detective Nash tendered the second installment for his fee. The court concluded that "at best" there was "an appearance of impropriety" and "at worst" there was "a per se conflict of interest" based on Stone's admission that a witness for the prosecution delivered to him a check for $3,500. The court recessed the case so that the parties could provide more information regarding the source of the funds delivered by Detective Nash.

When the parties reconvened, the State informed the court that the funds used to pay Stone were drawn on the checking account of Kurt's aunt (and Detective Nash's sister), but that Detective Nash intended to reimburse her. The court then questioned Detective Nash. Detective Nash testified that his 17-year-old son, Kurt, lived with him and that he was his son's sole source of support. Kurt was arrested on July 13, 2004. A public defender had been appointed to represent Kurt, but Detective Nash was not happy with this representation. In January or February 2005, Detective Nash encountered Stone and asked him to represent Kurt. Detective Nash briefly related the facts of the case to Stone, and Stone told him that his fee would be $7,500. Detective Nash found Stone's fee too expensive. However, Detective Nash's sister agreed to provide the money, and he verbally agreed to pay her back. After scheduling an appointment, Detective Nash and his son went to Stone's office. The court asked Detective Nash whether he spoke to Stone during his son's appointment. Detective Nash responded, "Just in reference to my complaint, the complaint that I had lodged while my son was locked up and at that time he did tell what would be my last time [sic] that the other man

is going to be up there meeting me. All the contact from there on out would be him and my son." Detective Nash related that he physically remained in Stone's office while Kurt spoke to Stone about the case. The court then allowed the parties to question Detective Nash. The State asked Detective Nash whether he believed that Kurt's rights were violated when he was arrested. Detective Nash responded in the affirmative. The State then asked Detective Nash whether there was the "potential" for a civil suit to be filed in connection with Kurt's arrest and whether there was the "potential" for Stone to represent him in that suit. Detective Nash responded in the affirmative to both inquiries. Detective Nash admitted, however, that Stone had yet to represent him. After hearing the parties' arguments, the court continued the matter so that it could fully consider the issues raised.

The parties next appeared in court on the morning of Thursday, April 21, 2005. At that time, the trial court rejected the State's position that a per se conflict of interest existed. Nevertheless, the court found that there was "a serious potential for conflict." In this regard, the court determined that Detective Nash had "an interest in the outcome of his son's case and is in fact considering the filing of a civil suit." The court found it likely that Stone would represent Detective Nash and his son in a civil suit and that any damages recovered in such an action could be used to repay the loan from Detective Nash's sister. Thus, the court concluded that Stone had a "business relationship" with Detective Nash. The court further found that Stone set the fee to represent Kurt knowing that Detective Nash felt that Kurt's civil rights had been violated, that the State intended to call Detective Nash as a witness at defendant's trial, and that Stone would be expected to cross-examine Detective Nash. The court stated that Detective Nash was "not just a parent hiring a lawyer to represent his son," but that he had "a vested and expressed interest in the outcome of his son's case." The court also noted that the State expected Detective Nash to testify about "the absence of evidence of a

stabbing or conflict between the defendant and the decedent in the location the defendant maintained he stabbed the decedent in self defense." The court characterized Detective Nash as a "prosecution witness, in some ways adverse to [defendant's] affirmative defense in this case according to the State and according to the first trial's evidence as recounted by Justice Kapala in his dissent in the appellate decision." Thus, the court concluded that Detective Nash was "akin to a client sharing Mr. Stone's representation and that share is with his son [sic]."

Having found a serious potential for conflict, the court decided to "exercise its discretion [and] deny defendant his right to counsel of his choice." The court recognized the strong presumption in favor of a defendant's counsel of choice but, after assessing the factors identified in Holmes and Ortega, determined that this presumption had been overcome. Despite its findings, the court stated that it would allow defendant to waive the potential conflict, and, as explained more thoroughly below, defendant ultimately exercised this option.

As noted, defendant now asserts that the State's conflict claim was "groundless," and he argues that the trial court's finding of a serious potential for conflict was not supported by the evidence, because: (1) Stone had no professional obligation to, or relationship with, Detective Nash; (2) Stone represented only Detective Nash's son, Kurt; and (3) Detective Nash did not pay Stone's fee on his son's behalf but, rather, it was Detective Nash's sister (Kurt's aunt) who paid the fee.

Not long ago, the Supreme Court noted that "nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials." Wheat, 486 U.S. at 162-63, 100 L. Ed. 2d at 151, 108 S. Ct. at 1699. Considering the record in light of the difficult nature of predicting potential conflicts of interest, we conclude that the trial court did not abuse its discretion in finding a serious potential for conflict. At defendant's first trial, the State presented evidence that

defendant and Hernandez fought in an alley behind a liquor store. See Collins, 351 Ill. App. 3d at 189-90 (Kapala, J., dissenting). Defendant testified that during that fight Hernandez produced a knife, causing him to believe that he was going to be stabbed. Defendant wrestled the knife away from Hernandez. Then, fearing that Hernandez would regain control of the knife, defendant stabbed Hernandez. At that point, the fight moved to the street. See Collins, 351 Ill. App. 3d at 190 (Kapala, J., dissenting). Detective Nash testified that he found no evidence of a fight behind the liquor store. Our decision reversing defendant's conviction and remanding the cause for a new trial was published on July 13, 2004 (Collins, 351 Ill. App. 3d 175), and our mandate in defendant's case issued December 30, 2004. Detective Nash contacted Stone early in 2005 about representing his son, and Stone agreed to do so. In other words, Stone, who had represented defendant at his original trial, knew that Detective Nash was a witness for the prosecution at that proceeding and that Detective Nash's testimony was adverse to the defense. Nevertheless, Stone accepted Detective Nash's offer to represent Kurt as well as money delivered by Detective Nash for Kurt's representation.

We are cognizant that Stone was retained to represent not Detective Nash, but his son, Kurt. However, it was within reason for the trial court to find that Detective Nash was "much akin to a client sharing Mr. Stone's representation." As noted, Detective Nash believed that his son's rights were violated during the arrest and he expressed interest in filing a civil suit against the law-enforcement agencies involved. The prospect of Stone handling the civil suit for the Nashes was not, as defendant contends in his brief, merely a speculative "plot" that was "hatched" by the State for the sole purpose of disqualifying an aggressive attorney. Although Detective Nash had not hired Stone in connection with the civil suit, he expressed interest in retaining Stone as counsel in that case, and there was evidence from which the trial court could have concluded that Detective Nash and Stone

(or someone from his firm) had at least discussed the viability of such a suit. Moreover, in arguing against the State's motion for disqualification, Stone stated on the record, "I prep a witness' son in a criminal case and perhaps some day if we do the criminal case in a 1983 action against the *** officers who perjured themselves in their police reports and caused this young man, that young man to spend nine months in jail when he didn't need to ***." This passage suggests that Stone was contemplating a civil suit against the law-enforcement agencies involved in Kurt's arrest. Based on this evidence, it was reasonable for the trial court to conclude that Detective Nash's relationship with Stone was more than that of a parent paying for his son's legal defense. Indeed, the trial court found that Detective Nash had a "vested and express interest in the outcome of his son's case" with respect to a complaint relating to Kurt's arrest and that any funds recovered in a civil suit could be used to reimburse Detective Nash's sister for paying Stone's fee. That Stone entered into this relationship knowing that Detective Nash was likely to testify at defendant's second trial as a witness adverse to defendant's interests provides further support for the trial court's finding.

Defendant emphasizes that the fee paid to Stone to represent Kurt came from Kurt's aunt, not from Detective Nash himself. In fact, Detective Nash told the trial court that he wanted to retain Stone, but the fee he quoted was too expensive. Subsequently, Detective Nash's sister offered to pay the fee, and Detective Nash verbally agreed to reimburse her. This suggests that Detective Nash would ultimately be responsible for the fee. Citing to People v. Moore, 189 Ill. 2d 521 (2000), defendant argues that, even if Detective Nash is considered to have paid Stone's fee, that circumstance, in and of itself, would not have been sufficient to create a conflict of interest. In Moore, the defendant argued that his attorney was acting under a per se conflict of interest because defense counsel was paid by the defendant's girlfriend, who was a potential witness for the State and

the defense. The supreme court rejected this argument on the basis that defense counsel did not have a contemporaneous professional relationship with the girlfriend or the girlfriend's attorney at the time defense counsel represented the defendant. Moore, 189 Ill. 2d at 538. Defendant cites Moore for the proposition that more is required to create a professional obligation for purposes of proving a conflict of interest than the mere payment of attorney fees. We do not dispute this proposition, but find that Moore is distinguishable as the existence of a per se conflict of interest was at issue there. Moreover, there is much more here than just the payment of attorney fees to support the trial court's finding that a professional obligation was created between Stone and Detective Nash. While Kurt was being tried as an adult, he was still a minor and Detective Nash was his sole source of support. In this regard, Detective Nash personally chose Stone to represent Kurt and he made the arrangements for Kurt and Stone to meet. Also, Detective Nash was present when Kurt met Stone, and Detective Nash discussed Kurt's case with Stone. Finally, we note that both Stone and Detective Nash expressed interest in bringing a civil suit related to Kurt's arrest and there was evidence from which the court could conclude that Detective Nash had at least raised the issue of a civil suit with someone at Stone's firm.

Defendant also suggests that Detective Nash would not have standing to file a lawsuit alleging injustices suffered by his son. However, even if Detective Nash would not have standing to bring a suit regarding his son's arrest, it is evident from the record that Stone knew that Detective Nash would decide who would handle the civil case. Ergo, Stone knew that Detective Nash would also decide whether he earned a fee for that case. The record here supports the trial court's conclusion that Detective Nash was serious about bringing a civil suit in connection with Kurt's arrest and that it was likely that Stone would be representing the interests of the Nashes with respect

to that action. Thus, it was not unreasonable for the trial court to find that the fact that Detective Nash would greatly influence who would handle the civil suit could affect the manner in which Stone cross-examined Detective Nash.

Relying on James, 368 Ill. App. 3d 433, and People v. Crowe, 327 Ill. App. 3d 930 (2002), defendant argues that, even if there was some potential conflict for Stone to represent Kurt in a future civil suit, the lower court's conclusions that the potential was "serious" and that defendant's right to Stone's undivided loyalty was imperiled thereby were "highly speculative and unreasonable." However, James and Crowe are distinguishable from the present case. The issue in each of those cases revolved around a conflict of interest created because the defendant's attorney was a potential witness at the defendant's trial. James, 368 Ill. App. 3d at 434-35; Crowe, 327 Ill. App. 3d at 934. In each case, the court of review reversed the trial court's decision to disqualify defense counsel. In Crowe, the court reversed on the basis that the attorney's testimony would have constituted inadmissible hearsay. Crowe, 327 Ill. App. 3d at 937-38. In James, the reviewing court found the disqualification improper for two reasons. First, it found unpersuasive the lower court's concern that the defendant's attorneys had a conflict of interest because they had previously represented a codefendant for whom they obtained an acquittal. James, 368 Ill. App. 3d at 436. Although the codefendant was expected to testify at the defendant's trial, the court noted that he no longer had an ongoing relationship with his former attorneys and that he had waived the attorney-client privilege. James, 368 Ill. App. 3d at 436. Second, the reviewing court was dissuaded by the State's concerns that defense counsel could be called as a witness regarding any inconsistencies between the codefendant's trial testimony and statements the codefendant provided defense counsel in preparation for trial. The court noted that it had no information regarding the statements made to defense

counsel and that there were alternatives to calling defense counsel for impeachment purposes. James, 368 Ill. App. 3d at 437-38. More important, the James court, citing to Crowe, noted that defense counsel's testimony likely would constitute inadmissible hearsay. James, 368 Ill. App. 3d at 437.

We agree with the State that the facts in this case are closer to those in Holmes, 141 Ill. 2d 204. There, the Illinois Supreme Court affirmed the trial court decision disqualifying the defendant's attorney of choice (Holt) due to a serious potential for conflict relating to defense counsel's relationship with a prosecution witness, even though there was uncertain evidence that the attorney and the witness had a contemporaneous attorney-client relationship. In so holding, the Holmes court stated:

"Williams was the State's key witness. Holt's relationship with the witness was long-standing, dating back at least 12 years prior to trial. Although the record is ambiguous regarding the specifics of that relationship, to conclude that the likelihood that Holt and Williams had an ongoing relationship was so great as to barring [sic] Holt from representing defendant was not a clear abuse of discretion. Holt had also represented Williams' brother. The record might fairly lead to the conclusion that Holt was the 'house counsel' for the Williams family." Holmes, 141 Ill. 2d at 226.

Applying the rationale set forth above, we cannot say that the trial court's finding that there were grounds to disqualify Stone was a clear abuse of discretion. Although Stone did not have a 12-year history of professional dealings with the Nashes, Stone was engaged in a contemporaneous attorney-client relationship with Detective Nash's son. More important, the evidence that Stone and Detective Nash were engaged in an ongoing professional relationship was stronger than the evidence found in

Holmes. In particular, the evidence hinted that Stone and Detective Nash were both aware of facts that could give rise to a civil suit in connection with Kurt's arrest, and both men hoped to receive financial gain from the suit. Finally, although Detective Nash was not the prosecution's key witness, his testimony was relevant to the issue of whether defendant killed Hernandez in self-defense.

This is undoubtedly a close case. The court had to decide whether Stone's contemporaneous representation of both Kurt and defendant presented a "serious potential for conflict." Defendant cites testimony from his second trial in support of his claim that a conflict did not in fact exist. However, the trial court did not have the luxury of hindsight to aid it, and the fact that a conflict never arose is irrelevant. See Crowe, 327 Ill. App. 3d at 935 ("[A] trial court has substantial latitude to refuse such waiver [of the conflict] not only where an actual conflict exists, but also where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses"). Based on the evidence before it, the trial court had to determine whether a conflict was "[c]apable of coming into being." Black's Law Dictionary 1188 (7th ed. 1999) (defining "potential"). In light of the difficulty of predicting nascent conflicts (Wheat, 486 U.S. at 162-63, 100 L. Ed. 2d at 151, 108 S. Ct. at 1699), we find that the trial court's decision that a serious potential for conflict was presented was not so fanciful, arbitrary, or unreasonable that no reasonable person would agree with it.

Having determined that the trial court did not abuse its discretion in finding that a serious potential for conflict would exist if Stone continued to represent defendant, we turn to whether the trial court erred in attributing to defendant the delay resulting from the resolution of the conflict issue. As noted previously, the speedy-trial term will be tolled where the delay is attributable to the defendant. 725 ILCS 5/103--5(a), (f) (West 2000); Jones, 273 Ill. App. 3d at 380. "A delay is

occasioned by the defendant when the defendant's acts caused or contributed to the delay." People v. Mayo, 198 Ill. 2d 530, 537 (2002). Thus, we must decide whether the trial court erred in finding that the delay between the date the State raised the conflict matter and the commencement of defendant's trial in November 2005 was attributable to defendant for the purpose of calculating the speedy-trial term. In resolving this issue, we are cognizant that the Act is to be construed liberally. People v. Turner, 128 Ill. 2d 540, 550 (1989). Nevertheless, as noted above, the defendant bears the burden of establishing facts that demonstrate a violation of the Act. Hall, 194 Ill. 2d at 327. On review, a trial court's determination as to whether a delay is attributable to the defendant is entitled to much deference and should be sustained absent a clear showing that the trial court abused its discretion. People v. Bowman, 138 Ill. 2d 131, 137 (1990); People v. C.H., 255 Ill. App. 3d 315, 318 (1993). Given the deferential standard of review, we again find it helpful to review some additional facts prior to addressing defendant's contentions.

After the trial court found a serious potential for conflict, it decided to "exercise its discretion [and] deny defendant his right to counsel of his choice." The court recognized the strong presumption in favor of a defendant's counsel of choice, but determined that this presumption had been overcome. In so deciding, the court assessed factors identified in Holmes and Ortega and concluded that (1) Stone's relationship with Detective Nash deprived defendant of his interest in having the undivided loyalty of his counsel and (2) it was probable that Stone's continued representation of defendant would provide grounds for overturning a conviction. Despite its findings, the court stated that it would allow defendant to waive the potential conflict. The court explained that, if defendant opted not to waive the potential conflict, Stone would be disqualified and defendant could hire another attorney or the court could appoint one for him. The court advised

defendant to first speak with Stone. The court told defendant that, if he wished to waive the potential conflict, "private counsel" would answer any questions for him. Stone immediately replied that he and defendant had discussed the issue, that defendant wanted Stone to continue representing him, that defendant "doesn't wish to waive any issue for appellate review," and that defendant was ready for and demanding trial. Stone added that, in the event the court chose to disqualify him, he had contacted attorney Richard Kling to serve as substitute defense counsel. Upon inquiry from the court, defendant stated that he did not want to speak with another attorney regarding his decision. The court then attempted to have defendant confirm whether he elected to waive the conflict. The court asked defendant whether he "wish[ed] to make any waiver." The court reiterated that there is "a serious potential for conflict" and inquired whether defendant "want[ed] to proceed knowing that that exists." Defendant responded that he was "ready for trial." The court then reaffirmed its finding that, in the absence of a waiver, Stone would be unable to represent defendant, and it continued the matter for defendant to secure or be appointed replacement counsel.

When the court reconvened that same afternoon (a Thursday), defendant told the court that he had yet to speak to Kling, but that he wanted Kling to represent him. Defendant rejected the court's offer to have other counsel appointed. The State told the court that four of its five witnesses were on leave from the Navy and that those witnesses were required to return to their duties by Monday. Defendant told the court that he would need one to two weeks to retain counsel. The court again asked defendant whether he "wish[ed] to waive any potential serious conflict." Defendant responded, "No, I don't wish to waive it." Consequently, the court discharged the jury that had been selected and continued the matter "at the request of the defendant," adding:

"Any delay in the term of the trial is going to be assessible [sic] to the defendant including the time that it has taken to determine the motion that the court has just decided with respect to the serious potential conflict which the court has found.

Just so you understand what I just said, Mr. Collins, that the delay until the next trial is going to be attributable not to the State, but to the defense with respect to the matter going towards a speedy trial. So the days that we were at when we reached this from the time that you filed your written demand for trial are going to stay the same. Do you understand?" Defendant responded in the affirmative. The State then proposed that the conflict could be avoided if the parties stipulated to the testimony Detective Nash provided at defendant's first trial. The court noted, however, that defendant was unrepresented and opined that it would not be "fair" for him to make such a decision in the absence of counsel.

On May 5, 2005, Kling appeared on defendant's behalf for the limited purpose of resolving the potential conflict found by the court. Kling also sought leave to file a written "Motion Seeking Stipulation as to the Transcribed Testimony of [Detective Nash] and the Agreement that Jed Stone May Appear as Counsel for [defendant]." At a hearing on May 12, 2005, Kling informed the court that defendant was willing to stipulate to Detective Nash's testimony, thereby allowing Stone to resume his role as defense counsel. The State responded that it was no longer willing to stipulate to Detective Nash's testimony. The State explained that the offer was made at a time when all of its witnesses were available to testify. That was no longer the case. In addition, the State opined that a stipulation would not remove the conflict because during closing arguments Stone would still be expected to discredit the evidentiary significance of Detective Nash's testimony.

Kling next appeared before the court on May 17, 2005. At that time, defendant told the court that he wanted to waive any potential conflict of interest and allow Stone to represent him. The court was concerned that defendant made his decision based on advice from Kling, an attorney recommended by Stone. To avoid any claim of a conflict arising from the circumstances surrounding Kling's representation, the court appointed attorney Alex Rafferty to advise defendant regarding his decision to waive the potential conflict. The court then presented a series of admonishments to defendant. Notably, the court informed defendant that by proceeding with Stone as counsel he would forever waive any prejudice he might suffer from a per se conflict of interest relating to Stone's relationship with Detective Nash. Defendant indicated that he understood. The court also told defendant:

"I don't think you are even going to be able to bring up any delay until this trial takes place as a result of these issues because in essence the issues I have found were because of a serious potential for conflict. That's attributable to you for speedy trial purposes. You understand that?"

Defendant questioned the court's admonishment relating to the speedy-trial term, and Kling informed the court that he neither advised nor intended to advise defendant in relationship to his right to a speedy trial. Kling opined that defendant should be advised regarding his right to a speedy trial by whomever ends up representing him. The court then reiterated:

"I don't think that if I let you waive this issue that you are not waiving also any delay in the trial from when we had a jury ready to be sworn until we get another jury ready to be sworn. I think you are giving that up. You understand that?"

The court added that defendant would not lose the days that had passed before this issue arose, but that "time has stopped until we start another trial." Defendant indicated that he understood. However, Kling stated that he was not sure that he agreed with the court's assessment. The State noted that, when it discovered the conflict, it was ready for trial and had flown in witnesses from different parts of the country. The State indicated that it would likely take more than a month to get its witnesses back to Lake County.

Ultimately, the trial court allowed Kling to withdraw. The court then had Rafferty ensure that defendant understood what he was giving up by agreeing to the waiver. After speaking with defendant, Rafferty told the court that he was convinced that defendant understood what he was doing. Thereafter, the court again admonished defendant. Defendant indicated that he understood what he was doing. The court discharged Rafferty and allowed Stone to enter his appearance. Stone informed the court that defendant was "ready for trial and demand[ed] trial." Stone then asked whether "the delay between [his] disqualification and today is attributable to the defense [would] be open for another day." The court responded:

"It will have to because I am finding right now that unequivocally without a doubt and for certain the delay in the trial was a defense delay resulting from the Court finding about a potential for serious conflict during jury selection, the State not finding out about it until jury selection as well, the Court dealing with that and then making specific findings that [defendant] was given the opportunity to waive, choosing not to waive during which time the State's witnesses were present. Both sides had answered ready for trial. A jury had been selected, but not sworn, and the fact that the defense counsel was disqualified due to that finding and [defendant] choosing not to waive that conflict as was his absolute right under

the law and now choosing after consulting with different attorneys to waive that conflict I do attribute that to the defense."

Stone replied that, in any event, defendant was ready for and demanding trial. The court then repeated that "[a]ny delays between now and when the witnesses are available are attributed to [defendant's] request."

Defendant's case came before the trial court for status on various status dates before all of the State's witnesses were again available for trial. On each status date, Stone told the court that defendant was ready for trial and that he demanded trial. The court responded by indicating that the delay was attributable to defendant for the reasons set forth in its May 17, 2005, ruling. On November 7, 2005, defendant filed a motion to dismiss the charges against him on speedy-trial grounds. Following a hearing, the court denied defendant's motion. The court reviewed the events that occurred since the State learned about Stone's relationship with the Nashes. The court stated that Detective Nash was an "essential prosecution witness" and that Stone's representation of both defendant and Kurt presented "serious potential for conflict." The court added that the State's motion to disqualify Stone was invited by Stone's disclosure on the day of jury selection that he had received funds to represent Kurt from Detective Nash and Detective Nash's admission that he was contemplating retaining Stone to represent him in a potential civil suit arising from Kurt's arrest. The court concluded that the speedy-trial term remained tolled following the events of April 19, 2005. The court later rejected defendant's posttrial motion asserting the same issue.

Defendant insists that the trial court's determination that his actions delayed the trial was wrong. Defendant reiterates that the delay resulting from the motion to disqualify Stone should be charged to the State because the State's claim was groundless. Defendant also claims that the delay

resulting from the State's efforts to reassemble its witnesses should be charged to the State. According to defendant, attributing either of these delays to the State would result in a speedy-trial violation. For the reasons below, we reject defendant's claims that either of these time periods should have been attributed to the State in calculating the speedy-trial term.

In addressing defendant's claims, we find instructive our opinion in People v. Solis, 207 Ill. App. 3d 357 (1991). In Solis, we identified various factors in deciding whether the delay in that case was attributable to the defendant. First, we considered that, at the time that he was representing the defendant, defense counsel in Solis voluntarily engaged in conduct that created a conflict that did not previously exist. Solis, 207 Ill. App. 3d at 362. We also considered that the defendant's attorney did not address the potential conflict in his representation of the defendant until it was raised by the State just days before the scheduled trial date. Solis, 207 Ill. App. 3d at 362. This case shares these same characteristics. Here, the potential for conflict, which we already determined was not groundless, was not raised by defense counsel. Rather, the State raised the issue during jury selection after defense counsel related that he had received money from a prosecution witness. The State acted diligently by presenting the issue to the trial court as soon as it learned that Detective Nash may have tendered part of the fee for Stone's representation. In addition, at the time that he was representing defendant, Stone voluntarily engaged in conduct that created a potential for conflict that did not previously exist, i.e., Stone accepted the fee from Detective Nash knowing that he was expected to testify adversely to defendant's position.

Defendant argues that any delay should not have been charged to him, because he was acting upon Stone's advice when he elected not to waive the potential conflict. According to defendant he did not decline to waive the potential conflict until after he had consulted Stone, the very attorney

whose loyalty was in question. However, after Stone asserted defendant's decision, the trial court personally asked defendant if he wanted to waive the potential conflict and talk to another attorney. Defendant responded in the negative. Thus, the trial court assured that Stone did not unduly influence defendant's decision. Moreover, defendant played an active role in exploiting the circumstances to place himself in a position to make a speedy-trial claim. Defendant insisted that Stone continue serving as his trial attorney despite the trial court's finding of a serious potential for conflict. See Bowman, 138 Ill. 2d at 140-41 (finding that defendant's acquiescence to a particular attorney's representation contributed to the delay; thus, delay would be charged to defendant). Further, after Stone was disqualified, defendant personally requested a continuance to retain a replacement attorney (chosen by Stone) who assisted defendant in ultimately having Stone reinstated as defense counsel. However, the reinstatement occurred only after the State's witnesses had been returned to their military duties. Had defendant accepted the court's waiver offer when it was first made, his trial would have undoubtedly commenced within the 120-day speedy-trial term. The State was ready at that time for trial to begin, and its witnesses were available to testify. In other words, it was defendant who set in motion the sequence of events that delayed his trial until November 2005.

Defendant asserts that the State could have obviated the potential for conflict by stipulating to Detective Nash's testimony at an earlier time. However, defendant also admits that the court could not compel the State to stipulate to Detective Nash's testimony (see People v. Williams, 81 Ill. App. 3d 122, 125-26 (1980) (rejecting defendant's request to force State to stipulate to admission of report favorable to the defense)), and defendant declined to waive the potential for a conflict of interest on the day that his trial was set to begin, even though the waiver would have allowed defendant to

immediately proceed to trial represented by Stone. Moreover, defendant declined to accept an appointed attorney to immediately try his case, opting instead to request a continuance and be represented by an attorney selected for him by Stone, knowing that the delay would, for an uncertain period of time, make some of the State's witnesses unavailable. For all these reasons, we conclude that the court did not abuse its discretion in attributing to defendant the delay in this case. As we stated in Solis, to hold that this delay is not attributable to defendant "would invite abuses or questionable applications of the speedy-trial provisions so that, whether inadvertent or contrived, conflicts could be created at the end of the term and the accused could escape trial on a technical application of the provisions." Solis, 207 Ill. App. 3d at 363.

Defendant further suggests that the trial could have taken place earlier. He points out that at a hearing on June 1, 2005, the State informed the court that all of its witnesses were available except for Seaman Joseph Hanson, who had been deployed to the Mediterranean sometime in May 2005. According to defendant, the record is "silent" as to whether the State made any effort to secure Hanson's presence between May 17 and the date when Hanson was deployed. Contrary to defendant's argument, the record demonstrates that it would have been impossible to assemble all of the State's witnesses and impanel a jury prior to Hanson's deployment. On May 17, 2005 (a Tuesday), the court indicated that its next trial call was Monday, May 23, 2005. The parties appeared before the court on May 23, 2005, and the State updated the court on the status of its five military witnesses. At that time, the State indicated that Hanson had already been sent to the Mediterranean and was not expected stateside again until November 15, 2005.

Alternatively, defendant argues that the State could have stipulated to Hanson's testimony, as his testimony at defendant's second trial was comparable to his testimony at the first trial and he

was not the only witness to detail the specifics of the encounter between defendant and Hernandez. We find this argument unpersuasive for at least two reasons. First, we point out that defendant is examining Hanson's testimony with the benefit of hindsight. At the time the trial court made its decision, it did not know how these witnesses would testify at the second trial, and there was no guarantee that the testimony would be comparable. Second, defendant, in effect, is suggesting that the trial court should have forced the State to stipulate to Hanson's testimony. However, defendant cites no authority for this position and, as noted previously, authority suggests that a trial court may not force the parties to make a stipulation. See Williams, 81 Ill. App. 3d at 125-26.

We distinguish People v. Roberts, 133 Ill. App. 3d 731 (1985), and People v. Collum, 98 Ill. App. 3d 385 (1981), two cases cited by defendant in support of his contention that the delay should not be charged to him. The courts in Roberts and Collum held that a defendant is not responsible for the delays resulting from a continuance to replace his or her appointed counsel where the defendant's counsel withdraws due to a conflict and neither the defendant nor his attorney could have prevented the circumstances that led to the attorney's withdrawal. Roberts, 133 Ill. App. 3d at 736-37; Collum, 98 Ill. App. 3d at 387. We note that, in this case, Stone was not defendant's appointed counsel and he did not voluntarily withdraw. Moreover, unlike in Roberts or Collum, after the court determined that a serious potential for conflict existed, defendant declined the court's offer to appoint counsel or to waive the potential conflict despite the fact that either of these decisions would have allowed the trial to proceed as scheduled within the 120-day speedy-trial term. Thus, he could have prevented the circumstances that led to Stone's withdrawal. In fact, defendant ultimately acquiesced to the waiver--but only after the 120-day speedy-trial term had run.

Lastly, defendant contends that the State could have requested a continuance pursuant to section 103--5(c) of the Act (725 ILCS 5/103--5(c) (West 2000)), but failed to do so. In light of our finding that the trial court properly attributed the delay to defendant, we find no need to address this argument. For all of the reasons set forth above, we conclude that the trial court did not abuse its discretion in attributing to defendant any delay between April 19, 2005, and the date of trial as the delay was occasioned by defendant's affirmative conduct.

In sum, we conclude that defendant's statutory right to a speedy trial was not violated. Accordingly, we affirm the judgment of the circuit court of Lake County.

Affirmed.

McLAREN and ZENOFF, JJ., concur.