2022 IL App (2d) 210494-U
No. 2-21-0494
Order filed July 20, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16 CF 1951 |
| MOHAMMAD HUSSAIN, | ) ) | Honorable Alice C. Tracy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  At defendant's trial on battery charges, the trial court properly denied defendant's motion for a mistrial based on testimony that defendant had just "returned from federal prison" and that he had an FBI fingerprint card.  Any prejudice to defendant was cured when the trial court sustained objections to the testimony, immediately admonished the jury to disregard the testimony, and later instructed the jury not to consider any testimony for which the trial court had sustained an objection.

¶ 2    Defendant, Mohammad Hussain, appeals his conviction of aggravated battery on a public way (720 ILCS 5/12-3.05(c) (West 2016)), contending that the trial court erred in denying his motion for a mistrial.  He contends that the State elicited testimony suggesting that he had previously committed a federal crime and that this evidence was so prejudicial as to deny him a

fair trial. We affirm because the testimony in question did not necessarily suggest that defendant had previously committed a federal crime, and, to the extent it did, the trial court cured any prejudice by sustaining objections to the testimony and instructing the jury to disregard it.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant was indicted on one count of aggravated battery with a deadly weapon (720 ILCS 5/12-3.05(f)(1) (West 2016)) and one count of aggravated battery on a public way (720 ILCS 5/12-3.05(c) (West 2016)).

¶ 5      The following facts were established at defendant's jury trial. On October 30, 2016, Syed Shah attended a religious gathering at a home in Carpentersville. One of Shah's friends, Aitezaz Syed, was also present.

¶ 6      As Shah and Syed sat in the basement listening to a speaker, Imran Aziz, another attendee, looked at Shah aggressively and angrily. After looking back at Aziz several times, Shah ignored him. Aziz also looked angrily at Syed. At that time, Shah did not speak to Aziz or have a physical altercation with him.

¶ 7      According to Shah, he knew Aziz because the two had been members of the same religious organization. However, because of religious disputes between members of that organization, Shah had left and started a new organization.

¶ 8      After the speaker finished, everyone went to the first floor of the home to eat. After eating, Shah, Syed, and an elderly companion decided to leave. Because the elderly person had stopped to talk with someone, Shah and Syed waited for him in the driveway near the street.

¶ 9      As the pair stood near the street, Shah noticed that Aziz was staring at him. When Shah looked back, Aziz said " 'F***, what the f*** are you looking at?' " Shah responded that he was looking at Aziz, trying to figure out why he was looking at Shah. Aziz then approached Shah,

came close to his face, and said, " 'Say that again.' " As Shah began to repeat what he had said, Aziz slapped him in the face.

¶ 10    At that point, Syed tried to separate the two men. Aziz then began punching Shah and Syed.

¶ 11    Aziz called for his cousin, defendant. Shah knew defendant from the religious organization that Shah had left. Defendant ran toward the three men.

¶ 12    As defendant approached, he told Shah, " 'I have to settle old scores with you. You opened up the new [religious] center. Now I'm gonna teach you a lesson.' " Defendant then began punching and kicking Shah, striking his head, face, and body. The blows were painful. According to Shah, he tried to grab defendant's wrist to defend himself. Shah could not recall throwing a punch at or kicking defendant.

¶ 13    At some point, several bystanders separated the men. Defendant, however, continued to try to hit Shah and Syed.

¶ 14    Once Shah was separated from defendant and Aziz, they both began to attack Syed. Aziz then went to his car, which was parked nearby, and grabbed a handgun from inside. According to Shah, Aziz put a magazine in the gun and approached Syed.

¶ 15    Shah testified that Aziz put the gun to Syed's chest and said that he was going to kill him. At the same time, defendant was punching Syed from behind. Syed tried to defend himself from both men. After Syed said something to Aziz, Aziz struck him in the face several times with the gun.

¶ 16    At that point, defendant again approached Shah and started punching him. Aziz then approached Shah with the gun and moved the slide as if to put a round in the chamber. Aziz put the gun to Shah's forehead. As he held the gun to Shah's forehead, Aziz said that Shah was a

" 'big talker' " and that he should " 'talk now.' " Shah did not say anything because he feared being shot. Shah was shown a State's exhibit that he identified as the Glock 9-millimeter used by Aziz.

¶ 17 As Shah stood still with the gun pointed at his forehead, defendant began punching and kicking him from behind. Aziz then began hitting Shah on the head with the butt of the gun. As Shah tried to duck, he noticed that defendant now had the gun. Shah did not, however, see Aziz give defendant the gun. Defendant then began striking Shah on the top of the head with the gun. As defendant did so, Shah felt blood running down his face.

¶ 18 Bystanders then separated Shah and defendant and took Shah into the house. Once inside, Shah saw defendant and Aziz attacking Syed. Shah then called 911. When Shah exited the house, still talking to the police on his phone, Aziz took the gun and drove away. As defendant headed toward his vehicle, the police arrived. Shah told the officers to arrest defendant and that Aziz had driven away.

¶ 19 As Shah was being treated in an ambulance, the police brought defendant in handcuffs and Shah identified him as one of the attackers. Shah was then taken to a hospital where he received a CT scan and five stitches to his head.

¶ 20 On cross-examination, Shah admitted that, after being banned from the religious organization he had left, he entered its building briefly to attend a friend's funeral. Shah also admitted that he had been charged in Cook County with criminal trespass to that religious organization's building. When defense counsel asked Shah if there was a conflict within the religious organization, Shah answered "yes" that "the conflict start[ed] as I am saying since 2009 is how I got to know [defendant] and [Aziz] because [defendant] had –what [Shah] had heard, had

just returned from federal prison." Defense counsel objected, and the trial court sustained the objection and "ask[ed] the jury to disregard that please."

¶ 21    Aitezaz Syed testified that he attended the October 30, 2016, religious gathering in Carpentersville. After a lecture and a meal, he and Shah, along with others, exited the home.

¶ 22    As Syed and Shah stood near the street waiting for a companion, Syed saw Aziz walking around. Aziz was looking at and cursing at Shah. Syed recognized Aziz but did not know his name at the time.

¶ 23    As Aziz approached Shah, he asked Shah why he was looking at him. He also cursed at Shah. According to Syed, Aziz then struck Shah in the face several times with his hand. When Syed asked Aziz why he was hitting Shah, Aziz began to punch Syed. Syed admitted that, in defending himself, he probably pushed Aziz several times.

¶ 24    As Syed and Aziz were fighting, Aziz called for defendant. Defendant then approached and began hitting Shah. As defendant hit Shah, Aziz continued to hit Syed. According to Syed, as bystanders intervened and held him and Shah, Aziz went to his car and obtained a gun.

¶ 25    After getting the gun, Aziz approached Syed, put the gun to Syed's chest, and told him that he was going to kill him. When Syed said, " '[G]o ahead,' " Aziz began to hit him in the face with the gun. Aziz then hit him with the butt of the gun several times in the back of the head.

¶ 26    After striking Syed with the gun, Aziz turned toward Shah. According to Syed, Aziz put the gun in Shah's face. Aziz then began hitting Shah on the head with the butt of the gun, and Shah began to bleed.

¶ 27    As Aziz struck Shah with the gun, defendant also punched and kicked Shah. At some point, Syed saw defendant with the gun, although Syed did not see Aziz give defendant the gun. According to Syed, defendant struck Shah in the head with the gun.

¶ 28    After people took Shah into the house, Aziz began to punch Syed in the face. Aziz had the gun again and struck Syed with it a couple of times. Later, Syed testified that he saw Aziz take the gun back from defendant. When Shah exited the house, he was talking to the police on his phone. Aziz then drove away. Defendant was still at the scene when the police arrived.

¶ 29    Syed was treated for his injuries at a hospital. He claimed that he has scars on his face and knee and back pain from the incident.

¶ 30    Sajid Mirza testified that he also attended the October 30 gathering. Mirza knew Shah, Syed, Aziz, and defendant from their religious community.

¶ 31    As Mirza stood outside the house talking with friends, he saw Shah, Syed, and Aziz talking near the street. At one point, Mirza turned around and saw Shah, Syed, and Aziz fighting. He saw Aziz push Shah. As he thought about intervening, Mirza saw Aziz take a gun from his car.

¶ 32    As Aziz approached Shah and Syed, Aziz called for defendant. Mirza could not recall seeing Aziz point the gun at anyone or strike anyone with the gun. Suddenly, Mirza saw that Shah's head was bleeding. He then saw Shah call 911.

¶ 33    Agha Hussain testified that he also attended the gathering. Agha Hussain knew Shah, Syed, and defendant. After the gathering had ended, as Agha Hussain exited the garage, he heard a commotion involving yelling, "bad words," and fighting. Shah, Syed, and defendant were exchanging the "bad words." The three began to fight, but there might have been a fourth party involved. Agha Hussain saw Shah on the ground and defendant was "up on him," hitting him with some object. Agha Hussain could not see what the object was. He could not tell if it was a gun. Defendant was also kicking and punching Shah. At one point, Shah's head began bleeding profusely. Eventually, others stepped in and broke up the fight. On cross-examination, Agha Hussain admitted that he did not see who started the fight.

¶ 34    Carpentersville police officer Paul Kruger responded to the scene. He spoke to Shah, Syed, and defendant. Defendant did not complain of any injuries or request medical attention. An ambulance was requested for Shah and Syed. Defendant was arrested and taken to the police station. On cross-examination, Officer Kruger testified that someone named Aziz had left the scene with a gun and that an alert had been issued for him.

¶ 35    Carpentersville police sergeant Thomas Heitkamp testified that, when he arrived at the scene, defendant was already in handcuffs in a squad car. Sergeant Heitkamp removed defendant from the squad and escorted him to another part of the scene for a show-up. Several people positively identified defendant as one of the assailants. When Sergeant Heitkamp asked defendant where the gun was, defendant answered that he had given it back to Aziz.

¶ 36    Carpentersville police officer Morgan Brown testified that Aziz arrived at the police station at about 5 p.m. on October 30, 2016. With Aziz's permission, Officer Brown searched his car. She found a Glock 19 in the center console. The magazine was loaded, but the chamber was empty.

¶ 37    Christine Aper, a forensic scientist specializing in latent fingerprint analysis, examined the Glock 19 for latent fingerprints. She found one latent print on the gun and one on the magazine. She compared the prints to those on a "fingerprint card marked Mohammad Azam Hussain." The prints on the gun did not match those of defendant, but they did match those of Officer Brown. When asked if defendant's fingerprint card was provided by the Carpentersville Police Department, Aper said no. When asked how she received the card, Aper said that she had obtained it "through the FBI or the Federal Bureau of Identification" [*sic*]. Defense counsel objected and moved for a mistrial, arguing that this was the second instance of testimony about "federal information" related to defendant. The prosecutor responded that, before Aper gave her answer,

he had assumed that the fingerprint card came from Carpentersville Police Department. The trial court found that both references were "inadvertent" and denied the motion for a mistrial. The court sustained the objection and "ask[ed] the jury to disregard the answer."

¶ 38    Bagar Zaidi testified for the defense. He attended the October 30, 2016, gathering. After the gathering had ended, Zaidi and others exited the house. As Zaidi was about to help defendant carry some catering equipment from the house, he heard someone call defendant's name. When Zaidi looked, he saw some people hitting Aziz.

¶ 39    According to Zaidi, he tried to separate Aziz from his attackers. At one point, Aziz went to his car and obtained a gun. After Aziz displayed the gun, people began to walk away. Zaidi denied that Aziz tried to hit anyone with the gun or that he gave the gun to defendant. Zaidi never saw defendant hit anyone with the gun, because "[h]e didn't even have it." Zaidi saw Aziz leave the scene before the police arrived. After Aziz left, defendant continued to load his car until the police stopped him.

¶ 40    On cross-examination, Zaidi explained that defendant was Zaidi's wife's cousin. Zaidi admitted that he did not see the fight start or know why it started.

¶ 41    Syed Nasir Hussain testified that he first met defendant at their religious center. Syed Hussain attended the October 30 gathering. After the gathering, as he was in his car preparing to go home, he saw a fight in the driveway. Initially, the fight was between Aziz, Shah, and Syed. When Aziz called for help, defendant joined in.

¶ 42    Syed Hussain then saw Aziz go to his car and return holding a gun. According to Syed Hussain, Aziz then tried to stop the fight. After people saw the gun, the fight stopped. Syed Hussain denied seeing Aziz strike anyone with the gun or defendant holding the gun. Syed Hussain left before the police arrived.

¶ 43    On cross-examination, Syed Hussain testified that Syed and Shah were provoking Aziz and that Aziz was provoking them.  Syed Hussain saw blood on Aziz's face but not on Shah's. According to Syed Hussain, defendant never punched anyone and only tried to separate the combatants.  Although he admitted that Aziz held the gun out to stop the fight, he denied that Aziz pressed the gun to Syed's chest or Shah's forehead.  He also denied seeing Aziz give the gun to defendant or defendant hitting Shah with the gun.

¶ 44    Defendant testified that he catered the October 30 gathering.  He denied having any unfriendly exchanges with anyone during the event.  After the speaker concluded, defendant served food.  After the meal, defendant began loading his catering equipment in his minivan.  While doing so, he spoke with one of the attendees.  During that conversation, he heard someone calling his name.  As defendant approached the person calling for him, he recognized him as his cousin, Aziz, who was being attacked by four people.  Shah, Syed, and two other young people were hitting Aziz.  Defendant saw blood on Aziz's face.  Defendant intervened to break up the fight, but both Shah and Syed started hitting him.  Defendant admitted that he hit them back.  Defendant feared for his safety because he and Aziz were outnumbered and two of the attackers were younger than defendant.

¶ 45    At one point, defendant heard Aziz shout, " 'Back off.' "  He then saw Aziz holding a handgun.  When Aziz displayed the gun, the fighting stopped.  Aziz did not strike anyone with the gun.  Defendant never had the gun.  Defendant denied telling the police that he gave the gun back to Aziz.  He also denied having had any objection to Shah starting his own religious group.

¶ 46    On cross-examination, defendant explained that, initially, he tried unsuccessfully to physically separate the fighters.  As he was trying to break up the fight, Shah pushed him.  He then began punching Shah and Syed.  Defendant denied that Aziz pointed the gun at anyone.  Defendant

admitted that, although Aziz was the one who was armed, he was concerned for Aziz's safety and told him to leave. He also admitted that Shah was bleeding during the fight. Although defendant suffered minor injuries, he acknowledged that he never reported those injuries to the police.

¶ 47    During the State's rebuttal, Sergeant Heitkamp reiterated that, when he asked defendant where the gun was, defendant answered that he gave it back to Aziz.

¶ 48    Before the jury deliberated, the trial court instructed it to disregard (1) any questions "to which objections were sustained," and (2) any testimony the court had "refused or stricken." The jury found defendant guilty of aggravated battery on a public way but not guilty of aggravated battery with a deadly weapon. Defendant filed a motion for a new trial, contending, among other things, that the court erred in denying his motion for a mistrial based on Aper's testimony about defendant's fingerprint card. The court denied the motion and sentenced defendant to 18 months' probation. Defendant filed this timely appeal.

¶ 49                                    II. ANALYSIS

¶ 50    On appeal, defendant contends that the trial court abused its discretion in denying his motion for a mistrial. Defendant asserts that Aper's testimony that defendant had an FBI fingerprint card, combined with Shah's testimony that defendant had recently returned from federal prison, suggested to the jury that defendant had committed a federal offense. Thus, he argues, the testimony was so prejudicial that it denied him a fair trial.

¶ 51    "A mistrial should be granted where an error of such gravity has occurred that the defendant has been denied fundamental fairness such that continuation of the proceedings would defeat the ends of justice." *People v. Nelson*, 235 Ill. 2d 386, 435 (2009). We review for an abuse of discretion the trial court's denial of a motion for a mistrial. *Nelson*, 235 Ill. 2d at 435. A trial

court abuses its discretion when its decision is arbitrary, fanciful, or unreasonable. *People v. Collins*, 382 Ill. App. 3d 149, 154 (2008).

¶ 52    Although a defendant is entitled to a trial free of improper questions or comments, not every improper question or comment requires reversal. *People v. Ramsey*, 239 Ill. 2d 342, 438 (2010). Rather, the court's sustaining an objection and instructing the jury to disregard the question or comment has usually been viewed as sufficient to cure any prejudice. *Ramsey*, 239 Ill. 2d at 438.

¶ 53    We begin with Shah's testimony. Defense counsel asked Shah if there was a conflict within the religious organization. Shah answered that there was and then volunteered that he had heard that defendant had returned recently from federal prison. Defense counsel immediately objected, and the trial court sustained the objection. To the extent that the jury might have inferred from Shah's comment that defendant had committed a federal crime, any prejudice to defendant was cured. First, it was a passing comment that did not relate to the question asked. Second, the trial court sustained the defense objection and promptly instructed the jury to disregard Shah's testimony. Third, in closing argument, the prosecutor never referred to Shah's comment about Shah returning from federal prison. Fourth, before the jury began to deliberate, the court reminded the jury that it was to disregard any testimony for which the court had sustained an objection. Considering the brevity of Shah's comment and the court's effort to minimize its impact with the jury, defendant was not unduly prejudiced.

¶ 54    We next address Aper's testimony about defendant's FBI fingerprint card coming from "the FBI or the Federal Bureau of Identification" [*sic*]. Generally, evidence of other crimes is not admissible unless it is relevant to connect the defendant with the specific charged offense. *People v. Maldonado*, 402 Ill. App. 3d 411, 426 (2010). However, a witness's isolated reference to

obtaining a defendant's fingerprint card from a database is not reversible error where it was necessary to explain the course of the investigation or was ambiguous as to whether the fingerprints were on file because of a prior criminal offense. *Maldonado*, 402 Ill. App. 3d at 426. A reference is considered isolated if neither direct evidence nor argument at trial concerned the defendant's prior criminal offenses. *Maldonado*, 402 Ill. App. 3d at 426 (citing *People v. Jackson*, 232 Ill. 2d 246, 269 (2009)). Generally, " '[a] law enforcement officer's isolated and ambiguous statement that he obtained [the] defendant's fingerprints from a state agency's database does not by itself indicate that [the] defendant has a criminal background.' " *Maldonado*, 402 Ill. App. 3d at 427 (quoting *People v. Jackson*, 304 Ill. App. 3d 883, 894 (1999). In addition to the isolated and ambiguous nature of a fingerprint card reference, an appellate court will also consider whether a limiting instruction was given. *Maldonado*, 402 Ill. App. 3d at 427.

¶ 55 Here, Aper's single reference to the source of the fingerprint card was brief. More importantly, she did not suggest that the card was in the database because of a prior criminal offense. Nor was there any further mention of the card or any other evidence that its source was connected to a prior criminal offense. Accordingly, the connection between the fingerprint card and a prior offense was tenuous at best. See *Maldonado*, 402 Ill. App. 3d at 428. Additionally, Aper's referenced the card only to describe how she proceeded with her part of the investigation. Further, defense counsel immediately objected, the trial court sustained the objection, and the court promptly instructed the jury to disregard Aper's reference to the source of the card. Thus, Aper's testimony regarding the source of the fingerprint card did not warrant a mistrial.

¶ 56 Defendant relies on *People v. Hudson*, 7 Ill. App. 3d 333 (1972), to suggest that testimony that a defendant has a fingerprint card on file with the police is sufficiently prejudicial to warrant a new trial. *Hudson*, however, is distinguishable from this case. In *Hudson*, a fingerprint expert

repeatedly referred to the defendant's fingerprint card, and the expert's "entire testimony manifested a clear implication" to the jury that the defendant's prints were on file with the Illinois Bureau of Identification. *Hudson*, 7 Ill. App. 3d at 337. Here, by contrast, Aper mentioned defendant's fingerprint card only once. Thus, *Hudson* does not support defendant's position.

¶ 57 Moreover, to the extent that Aper's testimony by itself suggested that defendant had previously committed a crime, any prejudice was cured when the trial court sustained defendant's objection and instructed the jury to disregard Aper's testimony about the fingerprint card. See *Ramsey*, 239 Ill. 2d at 438.

¶ 58 However, defendant asserts that the combination of Shah's testimony that defendant had just returned from federal prison and Aper's reference to his having an FBI fingerprint card was so prejudicial that it denied him a fair trial. We initially note that there is no indication that the prosecutor acted in bad faith here. Shah's testimony about defendant returning from federal prison was in response to defense counsel's questioning. As for Aper's testimony about the FBI fingerprint card, she offered that as part of her explanation of how she proceeded in conducting her fingerprint analysis rather than in response to a specific question from the prosecutor about the source of the fingerprint card. More importantly, as discussed, neither Shah's nor Aper's testimony, standing alone, was so prejudicial as to require a mistrial. Notwithstanding any possible prejudice from the combination of Shah's and Aper's testimony, the trial court sustained objections to both Shah's and Aper's testimony and promptly instructed the jury to disregard their testimony. Further, the court also instructed the jury immediately before deliberations that it was to disregard any testimony for which the court had sustained an objection. Additionally, there was no other mention of defendant having been to federal prison or having an FBI fingerprint card. Thus, any possibility of prejudice was cured by the court's rulings and instructions, which the jury is

presumed to have followed (see *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 61). Finally, to the extent Shah's and Aper's testimony was improper, it was inconsequential in light of the evidence of defendant's guilt.

¶ 59 Because defendant has failed to show that the combination of Shah's and Aper's testimony so prejudiced him that he was denied a fundamentally fair trial, the trial court did not abuse its discretion in denying his motion for a mistrial. Thus, we need not decide whether any error in denying the motion for a mistrial was harmless.

¶ 60                                III. CONCLUSION

¶ 61    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 62    Affirmed.