NOTICE

Decision filed 08/22/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190079-U

NO. 5-19-0079

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Christian County. |
| | ) | |
| v. | ) | No. 17-CF-194 |
| | ) | |
| LARRY L. SCOTT, | ) | Honorable |
| | ) | Bradley T. Paisley, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Barberis and Vaughan concurred in the judgment.

**ORDER**

¶ 1   *Held*: The defendant's statutory right to a speedy trial was not violated where he acquiesced to substantial portions of the delay by failing to demand a trial as required by statute. The evidence was sufficient to prove beyond a reasonable doubt that the defendant acted with the specific intent to kill, as is required to support his conviction for attempted murder. The defendant's claims of ineffective assistance of counsel fail where he is unable to demonstrate a reasonable probability that the outcome of his trial would have been different had counsel made the objections he now argues should have been made. The court did not abuse its discretion in admitting partially inaudible recordings of phone calls placed from the county jail. The defendant's sentence did not constitute an abuse of discretion.

¶ 2   The defendant, Larry L. Scott, was convicted of attempted first degree murder and sentenced to 45 years in prison. His sentence includes a mandatory enhancement due to a finding that he personally discharged a firearm and proximately caused great bodily harm. See 720 ILCS 5/8-4(c)(1)(D) (West 2016). On appeal, the defendant argues that (1) his right to a speedy trial was

1

violated due to numerous delays, most of which he attributes to the State, and because the trial court abused its discretion in granting the State's motion for a continuance to complete DNA testing; (2) the evidence was insufficient to support his conviction for attempted murder because there was insufficient evidence to prove beyond a reasonable doubt that he had the specific intent to kill; (3) the defendant received ineffective assistance of counsel because his attorney failed to object to the introduction of the prior consistent statements of two State witnesses and failed to object when the prosecutor cross-examined the defendant on whether State witnesses were lying; (4) the trial court abused its discretion in allowing the admission of recordings of telephone calls the defendant placed from jail while awaiting trial; and (5) his sentence was excessive. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The incident leading to the charges against the defendant took place approximately 11:30 on the night of September 14, 2017, in front of the home of Samantha Woods in Kincaid, Illinois. Logan Durbin was shot twice and seriously injured during an altercation involving the defendant and several other men. Multiple witnesses placed the defendant at the scene and stated that he had been in possession of a gun that night. Two witnesses directly identified him as the shooter.

¶ 5      The defendant was arrested and taken into custody shortly after midnight on September 15, 2017. He was charged with attempted first degree murder that day (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2016)). The State subsequently filed an amended information charging the defendant with aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), aggravated discharge of a firearm in the direction of another person (*id.* § 24-1.2(a)(2)), and reckless discharge of a firearm (*id.* § 24-1.5). The defendant remained in custody until his trial began in July 2018.

¶ 6      In January 2018, the State filed a motion for a continuance for DNA evidence (see 725 ILCS 5/103-5(c) (West 2016)). At an evidentiary hearing on the State's motion, forensic scientist

2

Cory Formea testified that the lab had expedited the processing of the evidence in this case in response to a request from either the prosecutor's office or the Kincaid Police Department. However, Formea did not say when the request was made. The court granted a continuance of "up to 120 days." The DNA results became available on April 3, 2018. The trial date was set for May 21, 2018, while additional forensic testing was performed.

¶ 7    The DNA and other forensic testing involved a handgun recovered from inside the home of Samantha Woods, which is where the defendant was arrested. Several witnesses had given statements indicating that they observed the defendant handling that gun earlier in the evening. Although most of the tests, including the DNA analysis, were inconclusive, ballistics testing indicated that at least a shell casing recovered from the crime scene was consistent with having been fired from that gun. Defense counsel moved for continuances to allow him to locate and interview witnesses to help him respond to this evidence, noting that it was the first forensic evidence to implicate the defendant.

¶ 8    In June 2018, the defendant filed a motion for discharge based on the defendant's statutory right to a speedy trial. The court denied that motion after a hearing. The defendant filed a motion to reconsider that ruling, which the court also denied.

¶ 9    Shortly before trial, the defendant filed a motion *in limine* seeking to exclude from evidence recordings of telephone calls he placed from the county jail while awaiting trial. In the recordings, the defendant can be heard telling someone to tell State witness Lucas Stephens that he was drunk and high on the night of the shooting. He can also be heard asking someone to contact State witness Shelby Collins to tell her the same thing and to tell her that he would "get out as long as she didn't come to court." In the recordings, the defendant also expresses satisfaction with the fact that a search warrant was executed at the wrong address. The defendant argued that the

3

recordings should not be admitted because portions were inaudible. The court listened to the recordings prior to ruling on their admissibility. At the motion hearing, the court noted that the "person on the receiving end speaking is very garbled" and "difficult to understand," but that "[y]ou can understand Mr. Scott." The court ruled that portions of the recordings were admissible. We note that the court excluded other portions of the recordings based on relevancy.

¶ 10    The defendant's trial began on Jul 18, 2018. Several witnesses described a party that took place at the apartment of John Ethan Zini on the night of the shooting. The defendant arrived at that party with his friends, Jerome Mason and Brandon Emery. Other attendees included Zini and Lucas Stephens. People at the party were drinking alcohol and taking drugs, although there was conflicting testimony concerning which drugs were present.

¶ 11    Multiple witnesses testified that some of the attendees, including the defendant, were passing around a black and silver handgun at the party. According to Mason, there were two guns, including the black and silver pistol, and the defendant was among the people who handled the gun. The defendant likewise testified that there were two guns. He further testified that Stephens attempted to sell one of the guns. Emery testified that he saw Stephens holding the gun and that he then left the apartment because he was not allowed to be around guns as a condition of his parole. On cross-examination, however, he admitted that he did not mention seeing a gun at the party when he gave a statement to police. He testified that that this was because he did not want to get anyone in trouble. According to Stephens, the defendant was the person who brought the gun to the party. Stephens testified that the defendant pulled out the gun, unloaded it, and allowed the others to pass it around. He stated that he told the defendant that he did not have to unload the gun before allowing others to handle it, to which the defendant replied, "You're not going to get me with my own gun."

4

¶ 12    The defendant left the party to buy alcohol at Food Mart, a nearby gas station convenience store. According to the defendant, Mason and Emery walked to the Food Mart with him. Both Emery and the defendant testified that during this walk, Emery pulled the defendant aside and suggested that he try to get the gun away from Stephens before someone got hurt. The defendant stated that he was initially reluctant to do so because he was on parole. According to Mason, Zini and Stephens accompanied Mason and the defendant to Food Mart. He did not mention Emery.

¶ 13    After buying alcohol, the group walked back to the party. It was during this walk that the altercation began that eventually led to the shooting. According to the defendant, he saw Stephens trading a gun for drugs on a street corner. Asked how he knew it was a drug deal, the defendant explained that Stephens had drugs when they returned to the party. According to Mason, they noticed another "group of guys" walking approximately 30 yards behind them. Mason further testified, however, that he and the defendant did not return to the party. He explained that they got into a vehicle with Shelby Collins and Keira Morrisey, who happened to drive by at this point. Mason assumed that Zini and Stephens returned to the party.

¶ 14    Jacob Graham was involved in the shooting but was not at Zini's party. At this point in the evening, he was in the vicinity of the Dial Street Apartments, where Zini lived. Graham testified that he was walking with John Burke when he saw Stephens and Zini making what looked to him like a drug deal behind a bar. He confronted them and "told them to get that stuff out of our town." This led to an altercation between Graham and Burke on one side and Stephens and Zini on the other. The altercation continued as the four men all walked toward the same apartment complex. According to Graham, he and Burke stayed outside one apartment, while Stephens and Zini stayed outside another.

5

¶ 15    Stephens likewise described an altercation between the same four men, but he testified that it began when he and Zini walked to Samantha Woods's house. According to Stephens, the argument began when Burke and Graham accused him and Zini of dealing drugs. Stephens denied they were doing so. He testified that the argument between the two groups continued all the way to Samantha Woods's house. At some point, Stephens called to the defendant, saying, "Hey, man, we've got him coming back." Stephens explained that he was referring to Graham. We note that he did not clarify where this took place or where the defendant was during this altercation.

¶ 16    According to the defendant, his group returned to the party at Zini's apartment, but Emery left shortly thereafter. He testified that Stephens was acting aggressive, so he called Emery to ask for a ride home. Emery told the defendant to ask Shelby Collins for a ride instead because she was in Kincaid with Keira Morrisey. The defendant further testified that while waiting for Collins and Morrisey to arrive, he convinced Zini to get Stephens's gun and give it to him because Stephens was acting "out of control." He explained that his intent was to bring it to a friend named Blake Knight to hold the gun for safe keeping until Stephens sobered up, and he testified that Mason and Emery had agreed to this plan. According to the defendant, he got a McDonald's bag out of the trash and held it open for Zini, who dropped Stephens's gun into the bag.

¶ 17    Keira Morrisey and Shelby Collins arrived and stayed at Zini's party for a short time before leaving with Mason and the defendant. Both women testified about what they observed at the party. Neither saw a gun while they were in Zini's apartment, but Morrisey testified that she heard people discussing a gun. Collins testified that while she was hugging the defendant and sitting in his lap, she felt a gun in his pocket. She further testified that the defendant told her about the gun at some point.

¶ 18    Collins, Morrisey, and the defendant all testified that they left the party together along with Mason. According to the defendant, they first stopped at Knight's house, where the defendant asked Knight to hold the gun until Stephens was sober. He testified, however, that Knight did not want the responsibility, so the gun remained in the defendant's possession. The defendant and Collins both testified that they stopped at a gas station, then drove around in the country for a short period of time before driving to Samantha Woods's house. Collins explained that she was staying at Woods's house to take care of her dogs because Woods was in jail. Morrisey and Mason likewise testified that the group drove around in the country before going to Woods's house.

¶ 19    As discussed earlier, other witnesses described an argument that continued as people walked towards Woods's house from the area of the Dial Street Apartments. Logan Durbin testified that he was walking towards Bradley Graham's house when he heard the commotion, which involved Jacob Graham, Stephens, and Zini. Bradley Graham is Jacob Graham's brother, and Durbin was friends with both Graham brothers. Durbin explained that he was aware that there was likely to be a fight, and that he had come to Kincaid from Taylorville that night to try to deescalate the situation. He testified that he followed Graham, Stephens, and Zini to Samantha Woods's house for this reason.

¶ 20    Mason, Collins, Morrisey, and the defendant all testified that a few minutes after they arrived at Woods's house and went inside, they heard a commotion outside. Morrisey testified that she did not see what happened outside the house, but she heard shots. Mason testified that after they heard the commotion outside, the defendant "charged" past him with a gun in his hand. Mason then heard the shots. When recalled as a witness for the defendant, however, Mason testified that he did not recall seeing a gun in the defendant's hand. He noted that it was too dark to see anything clearly. On cross-examination, Mason agreed that his prior testimony was true.

7

¶ 21 Collins testified that she went inside the house to let Woods's dogs out, then heard the commotion outside. She saw a group of about seven or eight people outside, including Zini and Stephens. They were arguing and pushing and shoving each other. Collins testified that the defendant ran "up toward the porch area" and then ran toward the street "where everyone was at." She testified that she saw the defendant pull out a gun and shoot Durbin two times.

¶ 22 According to the defendant, Stephens pounded on the front door demanding to get his gun back. The defendant testified that he told Stephens he had left the gun on the kitchen table, let him into the house, and went out to join the fight taking place in the street because he wanted to help Zini. During the fight, he heard gunshots. He testified that although he did not see who fired the shots, he saw a gun in Stephens's hand after the shooting.

¶ 23 Durbin testified that when he arrived at Woods's house, he saw the defendant emerge from the house. Graham ran toward Durbin and said, "Run, Logan, they've got a gun." Durbin then heard a gunshot and saw a muzzle flash. He testified that he turned around, heard another shot, and then felt the impact. After he was shot, Durbin saw the defendant, Stephens, and Zini running from the scene. He further testified that Mason approached him and asked him if he needed help. According to Durbin, he saw Zini, Graham, and Stephens before the shots were fired, and none of them had a gun. We note that he did not testify to seeing the defendant with a gun or seeing who fired the shots. Durbin did not see John Burke at the scene at all, and did not see Mason until after he was shot.

¶ 24 Graham testified that when he arrived at Woods's house, two men came out of the house. Meanwhile, Graham got into a fist fight with Stephens in front of the house. At some point, he saw the defendant behind him. Graham testified that he then saw the defendant go inside the house and come back out. He then heard two shots fired.

8

¶ 25    Stephens testified that he did not remember much of a scuffle outside Woods's house. According to Stephens, he saw the defendant emerge from the house and fire the shots. He testified that he was only approximately two or three feet away when this happened.

¶ 26    Collins, Morrisey, and the defendant all testified that they hid in the basement of Woods's house after the shooting. According to the defendant, Collins called to him to join her there. They took methamphetamines and then had sex before the police arrived. According to Collins, she told the defendant he should not be there, but he stayed anyway. She described his demeanor as "just a little freaked out." She explained that he was sweating, pacing, and looking out the windows. She testified that he began rubbing his hands on her clothing. According to Collins, when the police arrived and announced their presence, she, Morrisey, and the defendant pretended to be asleep. While they were pretending to be asleep, Collins and the defendant had sex. The police then entered the basement and arrested Collins, Morrisey, and the defendant.

¶ 27    Chief Wheeler testified that when police responded to the shooting, they searched the ground floor of Woods's house before working their way to the basement, where they found Morrisey, Collins, and the defendant. He further testified that during their initial search, they recovered a bullet in the kitchen, but did not recover a weapon. Two days later, Samantha Woods called to report that she found a gun in her bathroom while cleaning.

¶ 28    The State also introduced forensic evidence demonstrating that a shell casing found at the scene had fibers matching Durbin's clothing and was consistent with the black and silver gun. Finally, the State played recordings of the seven phone calls that were the subject of the defendant's motion *in limine*.

¶ 29    The defendant was among the last witnesses to testify. He first explained why he was in Kincaid on the night of the shooting. He stated that he had recently moved from Springfield to

9

Taylorville, but that on the night of shooting, he was preparing to return to Springfield after learning that his parole officer was looking for him. He later acknowledged that he knew this was because there was a warrant for his arrest. The defendant planned to get a ride back to Springfield from Brandon Emery, but first, he and Emery planned to "ride around" going to bars and getting drunk and high. However, Emery and the defendant met up with Jerome Mason, who told them that he wanted to go to the apartment of Ethan Zini in Kincaid, and Emery offered Mason a ride. We note that Emery testified that he arrived at Zini's apartment separately and that Mason and the defendant were already there.

¶ 30    When Mason, Emery, and the defendant arrived at Zini's apartment, a party was already in progress. As discussed earlier, the defendant testified that two guns were being passed around. He acknowledged handling one of the guns, but stated that he was initially reluctant to do so because he was on parole. Nevertheless, as we also discussed earlier, he testified that he ultimately did take possession of the gun before leaving Zini's apartment.

¶ 31    The defendant testified that prior to the night of the shooting, he had never met Jacob Graham, John Burke, Lucas Stephens, or Logan Durbin. He had met Zini a few weeks earlier when he visited his apartment with Mason. The defendant testified that there was a "bad vibe about" Stephens. He explained, "He was like real hyper and aggressive." He further testified that although Zini was not a violent person, "when he gets drunk, he's wild."

¶ 32    We have already discussed most of the defendant's testimony concerning the events that led up to the shooting. We need not repeat that discussion now. However, it is worth setting forth his testimony concerning what happened at Woods's house in greater detail.

¶ 33    The defendant testified that it was too dark to see anything inside the house because the power was out. He testified that he brought Stephens's gun into the house and left it on the kitchen

10

table, still inside the McDonald's bag. He estimated that about 10 minutes after their arrival, someone started banging on the door and screaming for "Brando." He explained that Brando was Brandon Emery's nickname, and that Emery was dating Woods at the time. He further explained that Collins was driving Woods's car. The defendant therefore thought that the person pounding on the door must have assumed that it was Emery who had driven the car to Woods's house. We note that, as mentioned earlier, Woods herself was in jail at the time.

¶ 34    The defendant testified that he did not know who was pounding on the door. He stated that he opened the door, and it was too dark to see who was there. However, he realized that it was Lucas Stephens when the man said, "Where the fuck is my gun?" The defendant told Stephens the gun was on the table. According to the defendant, Stephens entered the house and walked toward the kitchen, although the defendant acknowledged that he did not actually see him grab the gun.

¶ 35    The defendant next described the altercation that took place outside Woods's house. He stated that he saw a group of seven or eight people coming toward the porch. People in the group were using racial slurs and saying, "Brandon, come outside. Let's box. Let's fight." Asked if he could "see who any of those people were," the defendant replied, "I have never seen any of these guys a day in my life." He testified, however, that he recognized Zini as one of the people in the group. Zini was standing near the street, arguing with some of the others.

¶ 36    According to the defendant, a fight then broke out between Zini and others in the group. The defendant stated that he joined the fight to help Zini. During the fight, someone punched the defendant in the back of head. Then, he heard three shots. He opined that it sounded like two people were shooting at each other. He explained, "It was like pop, pop, then pow." He testified that he did not see who fired the shots, but he saw Stephens holding a gun as he ran away after the shooting. The defendant stated that he saw Stephens, Zini, and one other man running toward the

11

back of Woods's house and followed them until he heard Collins call his name. She told him to come to the basement, so he did.

¶ 37    The prosecutor began his cross-examination of the defendant by asking if the defendant decided to testify last so that he would hear their testimony before providing his own. Defense counsel objected, and the court sustained the objection. The prosecutor next asked, "And [you] went over all your discovery and reports with your attorney prior to court, right?" The defendant stated that he had reviewed the discovery. He added that he did not understand why people had told Chief Wheeler that Larry Scott was there when he did not know anyone in Kincaid.

¶ 38    The prosecutor next asked the defendant to acknowledge he was aware that Stephens and Shelby had identified him as the shooter in their video-recorded interviews. In response, the defendant indicated that he had not seen any of the video recordings of the interviews, but he stated that he had heard that Chief Wheeler was trying to get witnesses to lie. The following exchange took place without objection:

"Q. Okay. And so it's your testimony here today that Lucas Stephens is lying, right?

A. Oh, yeah. Definitely. Yes, sir.

* * *

Q. And that Logan Durbin saying that he saw you—didn't see the shot—but saw you pull a gun out is lying?

A. Yes, sir.

Q. And that Jacob Graham is lying?

A. Yes, sir. I mean, why wouldn't they lie for their friends? It's only right."

The prosecutor asked the defendant if that was the reason he contacted Emery and Mason asking them "to try and get ahold of the witnesses." The defendant replied, "This was way before trial. It

12

didn't have nothing to do with that. It was because I was hearing all these rumors *** about the Chief Wheeler was trying to get them to lie and say that they seen something that they didn't really see."

¶ 39   The following exchange then occurred:

"Q. Why would Shelby Collins lie?

A. She don't know me. Why wouldn't she lie? She don't know me.

Q. She was with you that night.

A. That don't mean she know me. We was just drunk having sex. She's not my friend. She got more loyalty to Lucas Stephens and Samantha than she does to me.

Q. Samantha wasn't there. She—

A. Well, that's her apartment. It all happened there.

Q. She's got no motive to lie.

A. I mean, why wouldn't she lie for her friend?

Q. That's not her friend.

A. I don't know, sir."

At this point, counsel objected to the line of questions on the basis that it was argumentative. The court sustained the objection.

¶ 40   In response to further questioning, the defendant acknowledged that he told Collins he would get out and be able to see his children if she did not show up for court. He also acknowledged that when he gave a statement to Chief Wheeler, he claimed to have no knowledge of the shooting.

¶ 41   During deliberations, the jury sent a note to the court asking to hear the recordings of the defendant's phone calls again. The court allowed them to do so. After further deliberation, the jury found the defendant guilty of attempted first degree murder. The jury also found that, in

13

committing the offense, the defendant personally discharged a firearm, proximately causing great bodily harm, permanent disability, or permanent disfigurement.

¶ 42   The defendant filed posttrial motions, all of which were denied. The court sentenced the defendant to 45 years in prison—20 years for attempted murder and a mandatory sentence enhancement of 25 years due to use of a firearm that caused great bodily harm or permanent disability or disfigurement. The defendant filed a motion to reconsider his sentence. The court denied that motion.

¶ 43   The defendant filed this timely appeal. We will discuss additional background information as necessary to our analysis of the issues the defendant has raised.

¶ 44                                    II. ANALYSIS

¶ 45                                  A. Speedy Trial Act

¶ 46   The defendant first argues that his statutory right to a speedy trial was violated. The defendant was taken into custody on September 15, 2017, and he remained in custody until his trial began 304 days later, on July 18, 2018. The Illinois Speedy Trial Act provides that a criminal defendant in custody must be tried within 120 days of being taken into custody, excluding delays attributable to the defendant. 725 ILCS 5/103-5(a) (West 2016). There are two applicable exceptions to this rule. First, the Intrastate Detainers Act extends the 120-day speedy trial period to 160 days if the defendant is "committed to any institution or facility or program of the Illinois Department of Corrections." 730 ILCS 5/3-8-10 (West 2016).[1] Second, the Speedy Trial Act itself

---

[1]To be more precise, the Intrastate Detainers Act makes subsection (b) of the speedy trial statute applicable to such defendants. 730 ILCS 5/3-8-10 (West 2016). That subsection generally applies to defendants who are on bond while awaiting trial, and it provides that they must be tried within 160 days of making a demand for a speedy trial. 725 ILCS 5/103-5(b) (West 2016). The State contends that these provisions are applicable to the defendant because a warrant was issued for his arrest based on violations of his mandatory supervised release four days before he was taken into custody on this charge. Although the defendant remained physically in custody in the Christian County jail, the State contends that he was in

14

permits a continuance of up to 120 days for DNA testing if the State can demonstrate that (1) the State has exercised due diligence to obtain the DNA results, (2) the evidence is material to the case, and (3) there are reasonable grounds to believe the results may be obtained later. 725 ILCS 5/103-5(c) (West 2016).

¶ 47 There are three components to the defendant's argument. First, he contends that the Intrastate Detainers Act does not apply and that, as such, the speedy trial deadline was 120 days. Second, he argues that the trial court abused its discretion in granting the State's motion for a DNA continuance because the State did not demonstrate that it exercised due diligence. Third, he contends that only 62 days of delay were attributable to him.

¶ 48 In response, the State contends that the Intrastate Detainers Act is applicable, that the court properly granted the State's motion for a continuance, and that all but 79 days of delay were attributable to the defendant. For the reasons that follow, we find that 211 days of delay were attributable to the defendant, leaving 93 days attributable to the State. Because this is within the 120-day speedy trial deadline, we need not resolve the parties' arguments concerning the applicability of the Intrastate Detainers Act or the propriety of the court's ruling on the motion for a DNA continuance.

¶ 49 Criminal defendants in Illinois have both a constitutional right and a statutory right to a speedy trial. The speedy trial statute is intended to implement the constitutional right to a speedy trial, but the statutory and constitutional speedy trial rights "are not necessarily coextensive." *People v. Janusz*, 2020 IL App (2d) 190017, ¶ 55. As noted previously, the speedy trial statute requires that a defendant who is in custody be tried within 120 days after being taken into custody

custody of the Department of Corrections (DOC) based on receipt for warrant issued by the DOC, which provided that the defendant could not be released on bail in this case.

15

"unless delay is occasioned by the defendant." 725 ILCS 5/103-5(a) (West 2016). The 120-day speedy trial clock begins to run automatically when the defendant is taken into custody, even if he does not demand a speedy trial. *People v. Myers*, 352 Ill. App. 3d 684, 687 (2004).

¶ 50    The primary issue before us is how much of the delay in this case was attributable to the defendant. As a general matter, delay is attributable to the defendant if he requests or agrees to a continuance. *Janusz*, 2020 IL App (2d) 190017, ¶ 57. Prior to a 1999 amendment to the speedy trial statute, an express agreement to a continuance was considered attributable to the defendant, but remaining silent and failing to object when the State requested a delay was not. *People v. Cordell*, 223 Ill. 2d 380, 386 (2006). Now, however, the statute expressly provides that "[d]elay shall be considered to be agreed to by the defendant unless he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record." 725 ILCS 5/103-5(a) (West 2016). The amended statute thus "places the onus on a defendant to take affirmative action when he becomes aware that his trial is being delayed." *Cordell*, 223 Ill. 2d at 391.

¶ 51    Because the Speedy Trial Act protects a defendant's constitutional right to a speedy trial, it is to be construed liberally in favor of the defendant. *Janusz*, 2020 IL App (2d) 190017, ¶ 56. However, we are also cognizant that delaying a trial beyond the statutory speedy trial period can inure to the strategic benefit of the defendant. *People v. Ingram*, 357 Ill. App. 3d 228, 234 (2005). For this reason, under some circumstances, a defendant can be forced to choose between his right to a speedy trial and other constitutional rights, such as the right to effective assistance of counsel. See *People v. Solis*, 207 Ill. App. 3d 357, 363 (1991). Moreover, the burden is on the defendant to demonstrate that his right to a speedy trial was violated. *People v. Collins*, 382 Ill. App. 3d 149, 161 (2008). On appeal, we review the trial court's determination as to whether delay was attributable to the defendant for an abuse of discretion. *Id.* However, we review *de novo* the

16

ultimate question of whether there was a violation of the Speedy Trial Act. *Janusz*, 2020 IL App (2d) 190017, ¶ 56. With these principles in mind, we turn our attention to the procedural history of this case.

¶ 52    On September 18, 2017, three days after his arrest, the defendant appeared in court with his first appointed attorney, Greg Grigsby. The matter was set for a preliminary hearing on October 3, the first available date. Grigsby informed the court of a possible conflict of interest due to his representation of an individual who was a possible witness. He indicated that he would need to confer with the prosecutor to determine whether his other client had given a statement. He therefore requested that the matter be set for a status hearing before the preliminary hearing. The court set a status hearing on September 21.

¶ 53    Although the State characterizes the defendant's agreement to these settings as "agreed continuances," we find that they do not constitute "delays" for purposes of the Speedy Trial Act. These dates were well within the 120-day speedy trial period, and they left ample time to set the matter for trial within 120 days. As our supreme court explained in *Cordell*, a delay is "[a]ny action by either party or the trial court that moves the trial date outside of that 120-day window." *Cordell*, 223 Ill. 2d at 390. This court has likewise observed that delay attributable to the defendant "has been construed to mean actual delay." *People v. McKinney*, 59 Ill. App. 3d 536, 541-42 (1978).

¶ 54    At the September 21, 2017, status hearing, Grigsby indicated that his other client, Jerome Mason, would be a witness. He stated that when he consulted with the defendant, the defendant indicated he wished to waive the conflict. Grigsby explained, however, that he needed to determine whether it was a waivable conflict. The court explained this to the defendant, who indicated that he understood the situation. The court set another status hearing for September 29 to address the conflict issue and left the preliminary hearing set for October 3. Because setting the additional

17

status hearing did not move the date of the preliminary hearing, we again find that agreement to that date did not constitute a delay for speedy trial purposes. See *Myers*, 352 Ill. App. 3d at 689 (finding no delay where the defendant's motions were resolved before the scheduled trial setting).

¶ 55    At the next status hearing, Grigsby indicated that the conflict was waivable and that both Mason and the defendant had agreed to waive it. However, this would require both clients to sign conflict waivers, and the preliminary hearing would need to be continued to give him time to obtain the signed waivers. Grigsby stated, "That's fine with Mr. Scott, Judge." The parties agreed to a new preliminary hearing date of October 26, 2017. We find that this resulted in a 23-day delay attributable to the defendant.

¶ 56    The defendant argues that continuing his preliminary hearing did not constitute a delay for speedy trial purposes because even when the matter eventually came for a preliminary hearing on November 30, 2017, the court offered a trial date of January 8, 2018, which was within the 120-day window. It was only because his attorney was unavailable that week due to another trial that the initial trial setting of January 29 was outside the window. We disagree.

¶ 57    As we have already discussed, under *Cordell*, a delay is "[a]*ny action *** that moves the trial date outside of that 120-day window.*" (Emphasis added.) *Cordell*, 223 Ill. 2d at 390. While the delays to the preliminary hearing did not, by themselves, move the trial beyond the 120-day speedy trial period, they certainly contributed to that occurring. Had the preliminary hearing taken place on October 3, 2017, as initially scheduled, trial dates in November or December likely would have been available. Thus, the continuance constituted delay for speedy trial purposes.

¶ 58    We note that the First District reached a similar conclusion in *People v. Wade*, 2013 IL App (1st) 112547. There, the defendant agreed to two continuances of the trial setting within the 120-day period. An additional delay due to a request for a continuance by the State then pushed

the start of the trial beyond that period. *Id.* ¶ 25. The First District rejected the defendant's argument that by agreeing to the first two continuances "he was merely acquiescing to a trial date within the 120-day period." *Id.*

¶ 59 Having found that the 23-day continuance constitutes delay, we must consider whether that delay is attributable to the defendant. Although the Fifth District has consistently held that delays for the purpose of finding conflict-free counsel are generally not attributable to the defendant (see, *e.g.*, *Myers*, 352 Ill. App. 3d at 688; *People v. Roberts*, 133 Ill. App. 3d 731, 738 (1985); *People v. Collum*, 98 Ill. App. 3d 385, 387 (1981); *McKinney*, 59 Ill. App. 3d at 541), our supreme court has limited the reach of those holdings to some extent. In *People v. Bowman*, the court explained that when an attorney has a conflict of interest, "both the attorney and the accused have no choice. The attorney must withdraw, and the accused must obtain another attorney or have new counsel appointed." *People v. Bowman*, 138 Ill. 2d 131, 145 (1990). The court held that under *those* circumstances, the rationale underlying Fifth District cases like *Roberts* and *Collum* was sound. *Id.*

¶ 60 We note that *Bowman* did not involve a withdrawal due to a conflict; rather, it involved the voluntary withdrawal of the defendant's second attorney followed by a request for a continuance by the defendant's third attorney to give him more time to prepare for trial. *Id.* at 135-36. In interpreting *Bowman* in the context of delays due to conflicts of interest, the Second District has held that such delays are only attributable to the State if "neither the defendant nor his attorney could have prevented the circumstances that led to the attorney's withdrawal." *Collins*, 382 Ill. App. 3d at 168 (distinguishing our decisions in *Roberts* and *Collum* on this basis); *People v. Solis*, 207 Ill. App. 3d 357, 362-63 (1991) (also distinguishing *Roberts* and *Collum* on this basis and explaining that its holding was consistent with *Bowman*).

19

¶ 61    Here, the delay was occasioned by the defendant's decision to waive the conflict and by counsel's failure to obtain the required signed waivers before the October 3 setting. These were matters over which the defendant and his attorney had some control. Thus, the 23-day delay is attributable to the defendant.

¶ 62    When the case came for the scheduled preliminary hearing on October 26, 2017, Grigsby informed the court that he learned through discovery that another of his clients, Jacob Graham, would also be a fact witness. Grigsby explained that this constituted an "absolute conflict of interest" that was not subject to waiver because Graham's expected testimony would be essential to the State's case. The court therefore allowed Grigsby to withdraw and appointed Marissa Sands to represent the defendant. The court set the matter for a status hearing five days later. Because neither Griggs nor the defendant had any choice in the matter and because the court immediately appointed Sands, the five days are not attributable to the defendant under *Bowman* or existing Fifth District precedent. See *Bowman*, 138 Ill. 2d at 145; *Myers*, 352 Ill. App. 3d at 688; *Collum*, 98 Ill. App. 3d at 387.

¶ 63    At the October 31, 2017, status hearing, the court informed the defendant that Sands, too, had to withdraw due to a conflict. The judge explained that he had spoken to attorney Tom Finks, who was willing to take the defendant's case, but Finks wanted to speak with the defendant first. The court suggested setting the case for another status hearing on November 9, which would give Finks a chance to consult with the defendant. When asked if this was okay with him, the defendant said, "Yes."

¶ 64    We find that the nine days between October 31 and November 9, 2017, constitute delay attributable to the defendant. We reach this conclusion for two reasons. First, the defendant affirmatively agreed to the delay on the record. Second, the purpose of the delay was to allow

Finks to meet with the defendant before agreeing to take his case. This is analogous to cases involving continuances to allow newly appointed counsel to prepare for trial. Such continuances are generally attributable to the defendant even if new counsel was appointed due to a previous attorney's conflict of interest. See *Collum*, 98 Ill. App. 3d at 387 (distinguishing delay necessary to appoint a new attorney due to a conflict from additional delay requested to allow the new attorney to prepare for trial). As such, the nine-day delay is attributable to the defendant. At this point in the proceedings, then, a total of 32 days were attributable to the defendant.

¶ 65    Finks appeared with the defendant at a status hearing on November 9, 2017. Finks indicated that he was asserting the defendant's right to a speedy trial and requested the earliest available date for a preliminary hearing.

¶ 66    The preliminary hearing was held on November 30, 2017. The court found probable cause to proceed to trial. Attorney Finks then entered a plea of not guilty on the defendant's behalf. The court noted that Finks was involved in another murder trial set for January and asked whether Finks had discussed this with the defendant. Finks replied, "Yes, in fact, I have, and to be very transparent, my client wishes for me to protect aggressively his speedy trial right." He noted, however, that he needed to discuss the matter of scheduling a trial with the defendant, and asked for a status hearing on December 5 for the purpose of setting a trial date. This continuance was requested by the defendant and delayed the court's ability to set the matter for trial. As such, we find that the 5 days were attributable to the defendant, for a total of 37 days up to this point in the proceedings.

¶ 67    On December 5, 2017, Finks requested a trial date of January 29, 2018. He noted that the defendant's position was that none of the prior delays were chargeable to the defendant and that the speedy trial period therefore ran until January 14. However, Finks was unavailable due to

21

another trial from January 8 until January 29. He acknowledged that this 21-day-period would be attributed to the defendant based on the unavailability of counsel. He further noted that he had discussed the matter with the defendant. The prosecutor then stated that "there will be laboratory issues in this case" and noted that the State "may be filing necessary motions." The court reminded the prosecutor that the State would be required to demonstrate due diligence, and noted that the state's attorney's office must inform the lab of the trial date. The prosecutor replied, "Now that we have a date, we will." The court set the trial for January 29, 2018, with a status hearing on January 4.

¶ 68     On January 4, 2018, the State filed its motion for a DNA continuance. At the status hearing held that day, the court set the State's motion for a hearing on January 25. We note that the State acknowledged that the period of delay from January 4 to January 25 was attributable to the State, while defense counsel had previously acknowledged that the period from January 8 to January 29 was attributable to the defendant. We find this period attributable to the State. Counsel's concession was based on his position that none of the delay prior to the December 5, 2017, status hearing was attributable to the defendant. As we have explained, however, 37 days were attributable to the defendant. Thus, as of January 4, 2018, the speedy trial period extended to February 20, and the original trial date of January 29 was within this period. Agreeing to a trial date within the speedy trial period does not constitute a delay for purposes of the Speedy Trial Act. *People v. LaFaire*, 374 Ill. App. 3d 461, 464 (2007); *People v. Workman*, 368 Ill. App. 3d 778, 785 (2006).

¶ 69     We find that the defendant acquiesced to the delay between January 29 and May 21, 2018. Although the defendant presented arguments in opposition the State's motion for a continuance, at the end of the January 25 motion hearing, Finks stated that he could "in good conscience" agree

22

to a continuance of 30 days. After that time, there were several status hearings. At no point did the defendant demand a trial date earlier than May 21.

¶ 70    At an April 3, 2018, status hearing, defense counsel Finks informed the court that the DNA test results were complete. He explained that because the testing revealed three or more contributors to the DNA sample obtained from the handgun, the evidence was inconclusive. Finks noted that other testing had not yet been completed, including gunshot residue testing. He argued that the speedy trial statute did not authorize delay for any type of testing other than DNA testing. However, he then stated, "Having said that, we're not sure when we will see those results and that may determine whether we have a May trial date or whether we have a date later than that at the request of the defendant." Trial was set for May 21, with a status hearing on April 24. The defendant did not demand trial before that date. As we explained earlier, the statute places an affirmative obligation on the defendant to demand a trial date to protect his right to a speedy trial. Otherwise, he is deemed to have agreed to the delay. *Ingram*, 357 Ill. App. 3d at 233. For these reasons, we find that the defendant is deemed to have agreed to the 112 days between January 29 and May 21. This delay was therefore attributable to the defendant, bringing the total to 149 days.

¶ 71    Finks received final discovery from the State on May 14, 2018, which was one week before the trial setting. This discovery included the results of gunshot residue and ballistics testing. The ballistics testing showed that a bullet casing recovered from the scene was consistent with the black and silver handgun several witnesses had seen in the defendant's possession. At a May 17 status hearing, Finks indicated that this was the only physical evidence implicating the defendant. Finks made a two-part motion. He requested that the evidence be excluded so the defendant would not be required to choose between his right to a speedy trial and allowing his attorney adequate

23

time to prepare to counter this evidence. Alternatively, he requested a continuance until June 18. The court granted the latter request.

¶ 72    In June, the defendant requested another continuance. As stated previously, he also filed a motion for discharge based on a speedy trial violation during this time, which the court denied. Trial began on July 18, 2018, which was 62 days after the May 21 trial setting. The defendant concedes that the remaining 62 days of delay were due to his requests for continuances and are attributable to him. This brings the total delay attributable to the defendant to 211 days with the remaining 93 days attributable to the State. Because this is within the 120-day window, we conclude that no speedy trial violation occurred.

¶ 73                              B. Sufficiency of the Evidence

¶ 74    The defendant next contends that the evidence was insufficient to prove him guilty of attempted murder beyond a reasonable doubt. He acknowledges there was sufficient evidence to prove he fired the shots that struck Logan Durbin. He argues, however, that the evidence was insufficient to prove beyond a reasonable doubt that he had the specific intent to kill Durbin or anyone else. As such, he urges this court to reduce his conviction to aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2016)) or discharge of a firearm in the direction of another person (*id.* § 24-1.2(a)(2))—lesser included offenses with which he was charged—and to remand the cause for a new sentencing hearing. We reject the defendant's contention.

¶ 75    When a defendant challenges the sufficiency of the evidence, the question before this court is whether any rational trier of fact could have found all of the essential elements of the offense charged beyond a reasonable doubt. *People v. Brown*, 2015 IL App (1st) 131873, ¶ 12. In answering this question, we consider the evidence in the light most favorable to the prosecution. We also recognize that the credibility of witnesses and the reasonable inferences to be drawn from

24

the evidence are decisions to be made by the jurors, not by this court. *Id*. We will not reverse a conviction based on insufficient evidence unless we find that "the evidence is so unreasonable, improbable, or unsatisfactory" that it creates a reasonable doubt as to the defendant's guilt. *Id*.

¶ 76 To prove a defendant guilty of attempted first degree murder, the State is required to prove two propositions. First, the State must establish that the defendant committed an act which constituted a substantial step towards murdering an individual. *People v. Garrett*, 216 Ill. App. 3d 348, 353 (1991). Second, the State must prove that the defendant acted with the specific intent to kill. *Brown*, 2015 IL App (1st) 131873, ¶ 14; *Garrett*, 216 Ill. App. 3d at 353. The State is required to prove each of these elements beyond a reasonable doubt. *Brown*, 2015 IL App (1st) 131873, ¶ 12. Here, only the element of the defendant's intent is at issue.

¶ 77 Because intent is a state of mind, intent to kill ordinarily must be established through circumstantial, rather than direct evidence. *People v. Teague*, 2013 IL App (1st) 110349, ¶ 24. The requisite intent to kill may be inferred from the circumstances surrounding the offense and from the defendant's conduct. In particular, an intent to kill may be inferred from evidence that the defendant voluntarily committed any act the natural tendency of which was to destroy another's life. *People v. Bailey*, 265 Ill. App. 3d 262, 273 (1994).

¶ 78 A defendant's intent can be inferred from circumstances such as the nature of the assault or the use of a deadly weapon. *Brown*, 2015 IL App (1st) 131873, ¶ 14. A brutal assault or life-threatening injuries are often indicative of a specific intent to kill. See *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 66. However, an intent to inflict great bodily harm is not sufficient to support a conviction for attempted first degree murder. *People v. Jones*, 184 Ill. App. 3d 412, 429 (1989). As such, an assault resulting in serious bodily harm will not always support the finding of intent necessary to sustain a conviction for attempted murder. *Id*. at 429-30. Similarly, use of a

25

deadly weapon such as a gun supports a finding of intent to kill, as the defendant acknowledges. See *Teague*, 2013 IL App (1st) 110349, ¶ 26; *Bailey*, 265 Ill. App. 3d at 273; *People v. Thorns*, 62 Ill. App. 3d 1028, 1031 (1978). However, the use of a gun or other deadly weapon is not dispositive. See *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001); *People v. Homes*, 274 Ill. App. 3d 612, 622 (1995).

¶ 79 Whether a defendant acted with the specific intent to kill a is a question for the jury, as the trier of fact. We will not overturn its determination "unless it clearly appears that there is reasonable doubt on the issue." *Brown*, 2015 IL App (1st) 131873, ¶ 14.

¶ 80 There are three components to the defendant's assertion that the evidence was insufficient to prove he acted with the specific intent to kill. First, he argues that there was no evidence that he aimed at anyone because it was too dark for him to do so. We reject his contention.

¶ 81 As the defendant correctly points out, the evidence showed that the power was off inside Woods's home and there were no streetlights on outside in the vicinity. However, several eyewitnesses identified individuals who were present outside the house and testified regarding what they saw occur, including the defendant. Indeed, the defendant himself testified that he was able to see a group of seven or eight people fighting in front of the house and that he recognized one of them as Ethan Zini. When asked if he recognized the others, the defendant did not state that it was too dark to see them; instead, he testified that he had never seen them before. This evidence indicates that the lighting was at least adequate for him to aim in the direction of the group of people fighting, and that is sufficient to support a finding of specific intent. See *Bailey*, 265 Ill. App. 3d at 273 (evidence that a defendant fired shots down a breezeway where a group of people were running was sufficient to prove beyond a reasonable doubt that he had the specific intent to kill).

¶ 82    Moreover, while poor lighting conditions may have impeded the defendant's ability to aim with precision, this does not negate his intent to do so. See, *e.g.*, *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 75 (noting that "frustrated marksmanship is not a defense to attempted murder"). Jurors were entitled to draw the reasonable inference that the defendant was aiming the gun with the intent to strike and kill someone in the group of people outside Woods's house. See *People v. Green*, 339 Ill. App. 3d 443, 452 (2003) (emphasizing that the inferences to be drawn from the evidence are decisions for the trier of fact).

¶ 83    Second, the defendant contends that evidence that he was intoxicated from drugs and alcohol negated his ability to form the specific intent to kill. In support of this proposition, he cites *People v. Slabon*, 2018 IL App (1st) 150149. However, *Slabon* does not support the defendant's position.

¶ 84    There, the defendant was convicted of aggravated battery. He argued on appeal that the trial court erred and deprived him of the ability to present a defense by excluding testimony about his state of intoxication. *Id.* ¶ 1. He argued that this evidence was necessary to show that, due to his intoxication, he did not have knowledge that his victim was a nurse performing her duties, which was an element of the crime as charged. *Id.* ¶¶ 30-31. In rejecting this claim, the First District noted that while voluntary intoxication is generally not a defense, it is relevant in cases involving specific intent crimes. The court explained that, assuming aggravated battery is a specific intent crime, evidence of the defendant's intoxication would thus be relevant to negate his ability to form that specific intent. *Id.* ¶ 33. The court noted a split of authority on that question, but did not find it necessary to resolve the issue. *Id.* ¶ 34. Instead, the court found that the evidence at trial established that the defendant had the requisite knowledge to commit the offense despite his intoxication. *Id.* ¶¶ 34-37.

¶ 85    Here, there is no dispute that the defendant was charged with an offense requiring proof of the specific intent to kill. Unlike the trial court in *Slabon*, the court here admitted evidence that the defendant had been drinking, smoking marijuana, and taking methamphetamine in the hours leading up to the shooting. However, while he correctly contends that evidence of his intoxication is relevant to the question of his ability to form the specific intent to kill, we do not believe the evidence showed that the defendant's state of intoxication was " 'so extreme as to suspend entirely the power of reasoning' " (*id.* ¶ 33 (quoting *People v. Cunningham*, 123 Ill. App. 2d 190, 209 (1970))), thereby rendering him incapable of forming that specific intent. As we discussed earlier, the defendant himself gave a detailed account of the events at issue, and at no point did any witness describe the defendant as displaying any significant impairment.

¶ 86    The final component to the defendant's challenge to the sufficiency of the evidence is an observation that no witness testified that he threatened anyone at the scene. Evidence that a defendant threatened an intended victim is obviously a relevant circumstance that can support a finding of the specific intent to kill. See, *e.g.*, *People v. Hill*, 276 Ill. App. 3d 683, 689 (1995). However, such evidence is not required. For the reasons we have discussed, we find that the evidence was sufficient to prove beyond a reasonable doubt that the defendant acted with the specific intent to kill.

¶ 87                              C. Ineffective Assistance of Counsel

¶ 88    The defendant next argues that he received ineffective assistance of counsel. He argues that counsel was ineffective for (1) failing to object to the introduction of prior consistent statements during the direct examination of two State witnesses and (2) failing to object when the prosecutor cross-examined the defendant about whether State witnesses were lying. We reject both claims.

28

¶ 89   We evaluate claims of ineffective assistance of counsel under the two-prong test established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). To satisfy that test, a defendant must show that his counsel's performance was deficient, and that he was prejudiced as a result. *Id.* at 687. To demonstrate deficient performance, the defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Id*. at 687-88. To establish prejudice, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

¶ 90   To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy both parts of the *Strickland* test. *People v. Morris*, 2013 IL App (1st) 110413, ¶ 62. Thus, if we find that the defendant cannot demonstrate prejudice from counsel's allegedly deficient performance, we may dispose of his claim on this basis alone. *Strickland*, 466 U.S. at 697.

¶ 91                    1. *Prior Consistent Statements*

¶ 92   The defendant's first claim of ineffective assistance of counsel involves counsel's failure to object to the admission of prior consistent statements made by two State witnesses, Lucas Stephens and Shelby Collins. During the direct examination of Stephens, the prosecutor asked whether he gave a video-recorded statement to Chief Wheeler. When Stephens stated that he did so, the prosecutor asked, "And in that did you state just as you did here today that you saw the defendant with your own eyes shoot Logan Durbin?" Stephens again replied, "Yes."

¶ 93   The prosecutor then asked Stephens about the statements he gave to Rhonda Keech, a private investigator for the defense. Stephens admitted that he initially told Keech he did not see the defendant on the night of the shootings. Stephens testified, however, that he called her the next day and gave a different statement. When asked why, Stephens testified, "Because it was eating at

29

me. *** So I made the phone call myself, and I told Rhonda that everything I told her was a lie yesterday, that it wasn't right, that I am going to testify against Larry Scott, and that he did shoot my friend, Logan Durbin."

¶ 94    On cross-examination, defense counsel also questioned Stephens about his statements to Keech. Stephens admitted that he spoke to her a total of three times. He acknowledged that the first time he spoke with her, he told her he did not see anything on the night of the shooting because he was too drunk. When asked whether, during his third conversation with Keech, he again stated that he was too drunk to see what happened on the night of the shooting, he denied it. He also admitted drinking alcohol on the night of the shooting, but he asserted that he was not intoxicated.

¶ 95    The defense later called Keech to testify about her conversations with Stephens. She had a total of four conversations with him. Keech testified that when she first contacted Stephens, he said he was drunk and stoned on the night of the shooting after going on a three-day drinking binge. He asserted that he did not see the defendant with a gun and did not see much of what happened that night. She further testified that Stephens called her the following day and told her that he "wasn't right in the head" during their first conversation and that he wanted to retract his statement. The next conversation took place at the Christian County jail. Keech explained that she visited him there to deliver a subpoena for his testimony. She stated that they spoke at length. During their conversation, Stephens again told her that "he was out-of-his-mind drunk" on the night of the shooting and that he did not see the defendant fire a gun. The fourth and final conversation took place in the Shelby County jail, where Keech again visited Stephens to deliver a subpoena. She testified that he said he was angry at the defendant and blamed the defendant for his transfer to Shelby County. We note that this final statement was admitted for the limited purpose of showing Stephens's state of mind.

¶ 96 Similarly, on direct examination, Shelby Collins was asked by the prosecutor whether she gave a statement to Chief Wheeler. She answered in the affirmative. The prosecutor then asked, "And did you tell him the truth as well during your interview with the chief?" She replied, "Yes." We note that she was not asked what she told Chief Wheeler or whether she told him the same things she told the jury during her testimony. On cross-examination, Collins acknowledged that during the first 30 minutes of her interview with Chief Wheeler she stated that she did not know anything about what happened.

¶ 97 The defense later recalled Chief Wheeler to the stand. He confirmed that during the first half hour of his interview with Collins, she told him she did not see anything or know what happened. He testified that she seemed to be "very scared," and that she eventually opened up after he reassured her by telling her that she was not a suspect. Chief Wheeler further testified that before transporting Collins to the police station for her interview, he asked her what happened, to which she replied, "Larry fucked up."

¶ 98 Generally, evidence that a witness made prior statements consistent with his or her trial testimony is not admissible during the direct examination of the witness. Such statements are hearsay, and they improperly bolster or corroborate the witness's testimony. *People v. Ruback*, 2013 IL App (3d) 110256, ¶ 26. However, prior consistent statements are admissible to rebut an express or implied charge that the witness has a motive to testify falsely or that the testimony is a recent fabrication. *Id.* Prior consistent statements are admissible for this purpose only if they were made before the existence of a motive to lie or before the recent fabrication. *People v. Crockett*, 314 Ill. App. 3d 389, 407 (2000).

¶ 99 Here, the prior consistent statements were elicited during direct examination, before any testimony was elicited suggesting that the witnesses were not being truthful. Introducing evidence

31

of a witness's prior consistent statements during direct examination in anticipation of impeaching evidence that might be introduced on cross-examination is not proper. *Id.* at 408. This is because if the evidence the statements are meant to rebut is *not* introduced during cross-examination, "it would leave the jury with unwarranted evidence of prior consistent statements." *Id*. However, the error will be deemed to be "technical" rather than substantive if the evidence actually elicited on cross-examination would have justified the admission of the prior consistent statements on redirect. *Id*.

¶ 100   The defendant argues both that there was no sound strategic reason for counsel to choose not to object to the testimony regarding these two witnesses' prior consistent statements during their direct examination and that he suffered prejudice as a result. In support of both arguments, he asserts that the credibility of Collins and Stephens was central to the case because they are the only two witnesses to testify that they saw the defendant fire the gun. We are not convinced. We need not consider whether counsel provided deficient representation by failing to object because we find that the defendant cannot establish prejudice.

¶ 101   We reach this conclusion for two reasons. First, as we have discussed, the evidence would have been admissible during redirect examination because defense counsel asked both witnesses about their prior statements denying knowledge of the shooting. Second, the evidence of the defendant's guilt was overwhelming. Although only Stephens and Collins saw the defendant fire the gun, the testimony of other witnesses, including that of the defendant's long-time friend, Jerome Mason, provided support for their accounts. Mason testified that he saw the defendant "charge" past him carrying a gun just before he heard the shots, although he gave inconsistent testimony when recalled as a witness for the defense. Jacob Graham testified that he saw the defendant leave the fight to go inside Samantha Woods's house and come back outside just before

32

the shots were fired. When considered along with the evidence that the defendant had taken possession of the gun, this leads to a reasonable inference that he went inside to retrieve the gun. In addition, no witnesses testified to seeing anyone else in the group in possession of a gun at the scene of the shooting. In the face of this evidence, we do not believe the defendant can demonstrate a reasonable probability that the outcome of his trial would have been different had counsel objected to the premature admission of the witnesses' statements. As such, we reject his claim of ineffective assistance. See *Strickland*, 466 U.S. at 697.

¶ 102                    2. *Cross-Examination About the Credibility of State Witnesses*

¶ 103   The defendant further contends that counsel was ineffective for failing to object when the prosecutor asked him during cross-examination whether he believed that four of the State's witnesses were lying. We reiterate that to succeed on this claim, the defendant must demonstrate not only that counsel's performance was objectively unreasonable, but also that there is a reasonable probability that the result of the trial would have been different had counsel objected. See *Strickland*, 466 U.S. at 697; *Morris*, 2013 IL App (1st) 110413, ¶ 62. We find that the defendant is unable to satisfy that burden.

¶ 104   As the defendant correctly contends, it is improper to question a defendant about his or her opinion of the veracity of other witnesses. Such questions invade the province of the jury, and they "also demean and ridicule the defendant." *People v. Schaffer*, 2014 IL App (1st) 113493, ¶ 49. Such questioning, while improper, "generally has not, by itself, been held reversible." *People v. Nwadiei*, 207 Ill. App. 3d 869, 876 (1990). Reversal may be warranted if the evidence is closely balanced and the credibility of witnesses is critical. Conversely, if the evidence of guilt is overwhelming, the error may be found to be harmless. *Schaffer*, 2014 IL App (1st) 113493, ¶ 49.

33

Also pertinent is how extensive the improper questioning is. *Id.* ¶ 56; *Nwadiei*, 207 Ill. App. 3d at 876-77.

¶ 105    Here, while the credibility of witnesses was an important consideration, as we have already explained, the evidence of the defendant's guilt was overwhelming. Moreover, the improper questioning was not extensive. The prosecutor asked the defendant whether he believed four of the State's witnesses were lying—Lucas Stephens, Shelby Collins, Jacob Graham, and Logan Durbin. There were no follow-up questions concerning Stephens, Graham, or Durbin. Although the prosecutor did ask the defendant additional questions concerning why he believed Collins had a motive to lie, the court sustained an objection to some of these questions on the basis that they were argumentative. We acknowledge that the defendant also testified that unidentified individuals had informed him that Chief Wheeler was urging people to lie about the case. However, this information was volunteered by the defendant.

¶ 106    The improper questioning in this case stands in stark contrast to the questioning that required reversal in *Schaffer* and *Nwadiei*, the cases relied upon by the defendant. We will briefly consider each case.

¶ 107    In *Schaffer*, the prosecutor asked the defendant whether the complaining witness made up numerous details in her account, whether evidence of a tear in her screen door made him look guilty, and whether two detectives were lying. *Schaffer*, 2014 IL App (1st) 113493, ¶ 50. The appellate court found that the evidence in that case was closely balanced. *Id.* ¶ 52. In holding that reversal was warranted, the court found it significant that "the prosecutor repeatedly asked defendant to comment on the veracity" of the complaining witness as well as that of the two detectives. *Id.* ¶ 56.

34

¶ 108    Similarly, in *Nwadiei*, "the prosecution devoted most of its cross-examination to asking Nwadiei whether six State's witnesses *** had lied." *Nwadiei*, 207 Ill. App. 3d at 876-77. In addition, the prosecutor asked the defendant whether a hypothetical investigator would be lying if he were to testify concerning unrelated conduct that may have constituted an offense. *Id.* at 877. The appeals court criticized this effort to "sidestep[ ]" the rule against admitting evidence of other offenses "merely by suggesting the existence of the evidence." *Id.* In finding that the questioning was prejudicial, the court emphasized that the prosecutor asked the defendant 23 questions about his opinion of the veracity of 6 important State witnesses as well as the hypothetical witness. *Id.* at 878.

¶ 109    The improper questioning in this case was far less extensive than that involved in either *Nwadiei* or *Schaffer*. Because of this, and because we have found that the evidence was overwhelming, we do not believe the defendant can demonstrate a reasonable probability that he would have been acquitted had counsel objected to more of the questions than he did. For these reasons, we reject his claims of ineffective assistance of counsel.

¶ 110                    D. Admission of the Defendant's Phone Calls From the County Jail

¶ 111    The defendant next argues that the court erred in admitting recordings of phone calls he placed from the county jail while awaiting trial. We disagree.

¶ 112    At issue are recordings of seven conversations between the defendant and unidentified individuals. The first conversation took place on April 25, 2018. In the recording, the defendant can be heard saying that there was "some very good news" and that "when they came through, they had a search warrant for the wrong motherfucking address." He can also be heard saying, "Remember your buddy, Stephens? Tell him he was drunk, high, and drunk on meth that night he

35

gave that statement." Finally, the defendant can be heard saying, "You and buddy need to squash that shit."

¶ 113   The second conversation took place later the same day. In the recording of the call, the other speaker can be heard saying, "He hasn't been online in 16 hours," to which the defendant can be heard replying, "Oh, I thought you know where he lived at." The defendant can also be heard saying, "Pick him up." At the end of the call, the defendant can be heard saying, "Choppo gang shit."

¶ 114   The third phone conversation at issue took place on April 30, 2018. In the recording, the defendant can be heard saying, "I need you to holler at buddy, tell him he was high as fuck when he gave that statement."

¶ 115   The fourth recording was of a May 5, 2018, conversation. In it, the defendant can be heard saying, "I need you to listen. As soon as I get off the phone, inbox Shelby. Tell her to call you or call her and tell her I will get out if they don't have nothing on me, I will get out as long as she don't come to court."

¶ 116   The fifth recording involved a call placed on May 12, 2018. The defendant can be heard saying, "Tell her she didn't see shit."

¶ 117   The sixth recording at issue was of a June 26, 2018, phone call. The defendant can be heard making the following statement:

> "I need you to holler at old girl. It's just her. I go back to court next week, Monday. I just went to court yesterday. She ain't answer when [inaudible] situation. Even my lawyer said [inaudible] the whole time she said 'I don't know, I don't know, I don't know' for 30 minutes straight. They kept saying, 'We know it was him, we know it was him.' She was just like fuck it."

36

The other speaker can be heard saying, "Lucas said he's rocking with us." The defendant can be heard saying, "I ain't trying to say so many names on bro phone."

¶ 118   The final recording involved a phone call placed later in the day on June 26. The defendant can be heard asking, "Did you holler at Eddie?" He can then be heard saying, "The only thing they really got is the parole violation. She don't even have to come but if she does, they gonna ask her. I want you to try to call Shorty, though, so you can know yourself what's going on." The other speaker can be heard saying in response that she will call Shelby.

¶ 119   As mentioned previously, the defendant filed a motion *in limine* shortly before trial asking the court to exclude these recordings from evidence on the basis that the inaudible portions were substantial enough to render the recordings unreliable. After listening to the recordings and holding a hearing, the court stated that although it was difficult to understand much of what the people on the other end of the line were saying, the defendant's statements could be understood.

¶ 120   Rulings on motions *in limine* are within the sound discretion of the trial court, and we will reverse the court's evidentiary rulings only if they constitute an abuse of discretion. *People v. Way*, 2017 IL 120023, ¶ 18. Partially inaudible sound recordings are admissible "unless the inaudible portions are so substantial" that the recordings are rendered "untrustworthy as a whole." *People v. Manning*, 182 Ill. 2d 193, 212 (1998). As with other evidentiary decisions, the admissibility of such recordings is a matter within the trial court's discretion. *Id*. A trial court abuses its discretion when its decision is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view as the court. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 121   In support of his position, the defendant calls our attention to the Illinois Supreme Court's decision in *People v. Hunt*, 234 Ill. 2d 49 (2009). We find *Hunt* distinguishable.

37

¶ 122   That case involved recorded conversations between the defendant and a police informant. *Id.* at 53. The defendant filed a motion to suppress the recordings of those conversations and the statements he made to the informant, asserting that the recordings were "substantially inaudible." *Id.* at 54. The State countered this argument by emphasizing that the defendant could be heard making incriminating statements in the recordings. *Id.* After listening to the recordings and holding two hearings in the matter, the trial court granted the defendant's motion to suppress, finding that the recordings were inaudible and "worthless." *Id.* at 54-55.

¶ 123   The State filed a certificate of impairment and appealed that ruling. *Id.* at 55. Both the appellate court and the supreme court affirmed the trial court's decision "as within the sound discretion of the trial court." *Id.* at 66.

¶ 124   Here, unlike in *Hunt*, the trial court did not find the recordings at issue to be so indiscernible or inaudible as to be "worthless." Indeed, as noted earlier, the court expressly found that the defendant could be understood. We find no abuse of discretion in this ruling.

¶ 125   Finally, it is worth noting that there was also testimony from two witnesses that the defendant or his associates had attempted to influence the testimony of some of the State's witnesses. Lucas Stephens testified that he was approached by some individuals to discuss his testimony. He further testified that those individuals wanted him to give testimony that was different from the testimony he gave. Jerome Mason acknowledged in response to questions from the prosecutor that the defendant called him on the phone asking him to contact other witnesses to tell them what to say. Mason testified that he asked the defendant to stop calling him about this issue because Mason "just knew it wasn't a good look." While the recordings illustrate more dramatically the extent of the defendant's efforts to influence the witnesses, evidence that he did so would have been put before the jury even if the court had excluded the recordings.

¶ 126                                           E. Sentence

¶ 127   The defendant's final argument is that the court abused its discretion in imposing a 45-year sentence. He argues that the sentence was excessive because the court failed to give adequate consideration to evidence of his difficult upbringing and his mental health and failed to take into account or "act on" his rehabilitative potential. We disagree.

¶ 128   The presentence investigation report (PSI) revealed that the defendant had been diagnosed with bipolar disorder, depression, and anxiety; that he had a learning disability; that he struggled with substance abuse and addiction; and that he had a difficult childhood. The defendant completed an adverse childhood experience assessment and scored 7 out of 10. The PSI further revealed that the defendant had eight prior felony convictions, nine prior misdemeanor convictions, and several traffic violations.

¶ 129   At the sentencing hearing, Logan Durbin testified about the continuing physical pain and psychological distress caused by the shooting. Chief Wheeler testified that after Keira Morrisey testified for the State, she called the police to report that her house had been spray-painted with the word "snitch" and her car had been egged. Evidence was also presented about the defendant's multiple infractions while in jail awaiting trial, including an assault on jail administrator Rohn Burke.

¶ 130   As evidence in mitigation, the defendant presented the testimony of Jeff Stickel and his daughter, Amanda. Both testified that when the defendant rented a room from Jeff, he was helpful and respectful and did not behave violently. The defendant made a statement in allocution, during which he told Durbin that he felt sorry for what happened to him, but denied being the shooter. The defendant also talked about his difficult childhood and stated that he wanted to take advantage of whatever rehabilitative programs would be available to him in prison.

¶ 131　In ruling from the bench, the court found that the defendant's prior criminal history was "obviously a significantly aggravating factor for Mr. Scott." See 730 ILCS 5/5-5-3.2(a)(3) (West 2016). Other statutory factors in aggravation the court found to be relevant were the need to deter others (*id.* § 5-5-3.2(a)(7)) and the fact that the defendant committed the offense while on mandatory supervised release (*id.* § 5-5-3.2(a)(12)). Additional nonstatutory aggravating factors found by the court were the need to protect the public from the defendant, the fact that the defendant incurred multiple disciplinary actions while in jail awaiting trial, and the evidence that the defendant attempted to intimidate witnesses.

¶ 132　Although the court did not find that any statutory factors in mitigation were present, it did consider three nonstatutory factors in mitigation. Specifically, the court found that the defendant's learning disability, his upbringing, and his mental health conditions were mitigating factors the court could consider. The court particularly emphasized the defendant's upbringing, noting that his score on the adverse childhood experience assessment was "off the charts."

¶ 133　The court sentenced the defendant to 45 years in prison. As stated earlier, the defendant now challenges this sentence, arguing that the court failed to give adequate consideration to the mitigating evidence we have discussed and failed to act on his rehabilitative potential. We are not persuaded.

¶ 134　Trial courts "are afforded broad discretionary powers" in sentencing. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 26. We give the trial court great deference on sentencing decisions, recognizing that the trial judge was in the best position to assess and weigh such pertinent factors as the defendant's credibility, demeanor, moral character, social environment, age, and habits. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). We will not alter a defendant's sentence absent an

abuse of the trial court's considerable discretion. *Id.* at 209-10; *People v. Busse*, 2016 IL App (1st) 142941, ¶ 20.

¶ 135   A sentence within the statutorily prescribed range is presumed to be proper. *Etherton*, 2017 IL App (5th) 140427, ¶ 28. We will find a sentence within this range to be an abuse of discretion only where the court's decision is "arbitrary, fanciful, unreasonable, or where no reasonable person" would adopt the court's position (*id.* ¶ 26), or if the sentence is "greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense" (*People v. Fern*, 189 Ill. 2d 48, 54 (1999)). A sentence comports with "the spirit and purpose" of our sentencing laws if it reflects both the seriousness of the offense and the rehabilitative potential of the defendant. *Etherton*, 2017 IL App (5th) 140427, ¶ 28.

¶ 136   The trial court is required to consider any mitigating evidence placed before it. *People v. Cord*, 239 Ill. App. 3d 960, 968 (1993). However, the court is not required to give such evidence more weight than it gives the aggravating factors. The seriousness of the offense is one of the most important factors. *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 32.

¶ 137   Here, as the defendant acknowledges, the court imposed a sentence within the statutory range. The sentence for attempted murder is generally the sentence for a Class X felony, which is 6 to 30 years. 720 ILCS 5/8-4(c)(1) (West 2016); 730 ILCS 5/5-4.5-25(a) (West 2016). In addition, there is a mandatory sentence enhancement of 25 years to natural life when a jury finds that the defendant personally discharged a firearm, thereby proximately causing great bodily harm, permanent disability, permanent disfigurement, or death. 720 ILCS 5/8-4(c)(1)(D) (West 2016). Here, the defendant received a sentence of 20 years for attempted murder, which is a mid-range sentence for that offense, and an enhancement of 25 years, which is the minimum.

¶ 138   The defendant nevertheless contends that this mid-range sentence constitutes an abuse of discretion because the court gave inadequate consideration to the mitigating evidence concerning his difficult childhood and his mental health diagnoses. We disagree. We note that, absent evidence to the contrary other than the sentence itself, we must presume the court considered any mitigating evidence placed before it. *Weiser*, 2013 IL App (5th) 120055, ¶ 31. Here, we need not rely on this presumption. The court explicitly stated that it found the defendant's mental health diagnoses and his difficult childhood to be factors in mitigation. Additionally, there was significant aggravating evidence in this case. As mentioned earlier, the defendant had an extensive criminal history; he committed the offense while on mandatory supervised release; he committed multiple infractions while in jail awaiting trial, including an assault; and there was evidence he engaged in an effort to influence the testimony of the witnesses. The court's decision to impose a mid-range sentence in the face of this aggravating evidence shows that the court gave some weight to the mitigating evidence.

¶ 139   The defendant also contends that the trial court erred by failing to "act on" his rehabilitative potential. This is so, he explains, because he will not be released from prison until he is at least 72 years old. Although the court did not make an express finding concerning the defendant's rehabilitative potential—something the court was not required to do—we believe the court did appropriately consider this factor. The court emphasized the fact that the defendant continued to commit crimes throughout his adult life. In his argument on appeal, the only evidence of rehabilitative potential the defendant can point to is his statement in allocution, where he told the court that he wanted to take advantage of rehabilitative programs in prison. Under the circumstances, we find no abuse of discretion.

¶ 140   We also note that before ruling, the trial court pointed out that because the defendant was 36 years old, even the minimum sentence of 31 years would result in him spending most of the remainder of his life in prison. The court was not required to overlook the significant aggravating factors and impose the minimum sentence under the circumstances of this case. We find no abuse of discretion.

¶ 141                                           III. CONCLUSION

¶ 142   For the foregoing reasons, we affirm the defendant's conviction and sentence.


¶ 143   Affirmed.